## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIAM P. RAMEY, III AND RAMEY LLP,** **Plaintiffs,** | § § § § | |
| **v.** | § § § § § | Civil Action No. _____ |
| **JONATHAN STROUD; UNIFIED PATENTS, LLC; BLOOMBERG L.P.; AND RPX CORPORATION,** **Defendants.** | § § § § § | **JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs, William P. Ramey, III and Ramey LLP (collectively, "Plaintiffs"), file this Original Complaint against the above-named Defendants Jonathan Stroud, Unified Patents LLC, Bloomberg, L.P., and RPX Corporation (collectively "Defendants") and would respectfully show as follows:

### PARTIES

1.    Plaintiff William P. Ramey III ("Ramey" or "Mr. Ramey") is a private individual residing in Harris County, Texas.

2.    Plaintiff Ramey LLP is a Texas limited liability partnership with its principal place of business in Harris County, Texas.

3.     Defendant Jonathan Stroud ("Stroud") is believed to be an individual residing in Washington D.C. and may be served with process at his residence or anywhere else he can be found.

4.     Defendant Unified Patents, LLC ("Unified") is believed to be a limited liability company organized under the laws of Maryland, with its principal place of business in Chevy Chase, Maryland. Unified may be served with process by serving its registered agent, the Corporation Trust Incorporated, 2405 York Road, suite 201, Lutherville Timonium, Maryland 21093, or wherever it may be found.

5.     Defendant RPX Corporation ("RPX") is believed to be a corporation organized under the laws of Delaware, with its principal place of business in San Francisco, California. RPX may be served with process by serving its registered agent, Incorporating Services, Ltd., Sapphire McFarland 7801 Folsom Blvd. #202, Sacramento, California 95826, or wherever it may be found.

6.     Defendant Bloomberg L.P. ("Bloomberg") is a limited partnership organized under the laws of Virginia, with its principal place of business in New York, New York, and may be served by serving its registered agent, Corporation Service Company, 100 Shockoe Slip, Fl. 2, Richmond, Virginia 32319.

## JURISDICTION AND VENUE

7.     This civil action arises under the Diversity Laws of the United States, 28 U.S.C. § 1332. This statute grants federal district courts original jurisdiction over civil actions where the matter in controversy exceeds $75,000.00 (exclusive of interest and costs) and the parties are citizens of different states, or citizens of a state and a foreign state.

8.     This civil action further arises under 28 U.S.C. § 1367, for the claims of defamation, business disparagement, conspiracy, and unfair competition and tortious interference, where the

court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Personal jurisdiction exists over Defendants because Defendants have minimum contacts with this forum because of business regularly conducted within the State of Texas and within this district, and, on information and belief, specifically as a result of, at least, committing the tort of defamation against, Ramey, a resident of Harris County, within this District. Accordingly, this Court's jurisdiction over the Defendants comports with the constitutional standards of fair play and substantial justice and arises directly from the Defendant's purposeful minimum contacts with the State of Texas.

10.     The Court has personal jurisdiction over each Defendant because, among other things:

   a.   Many of the wrongful acts and omissions occurred in Texas, including Harris County.

   b.   Several Defendants reside in Texas or maintain offices and employees in Texas.

   c.   Defendants purposefully directed tortious conduct and defamatory publications into Texas, including to Texas courts, Texas clients and prospective clients, and the Texas legal community.

   d.   The February 24, 2025 Bloomberg article "Lawyer Big Tech Loves to Hate Wears Backlash as 'Badge of Honor'" was researched in Texas, quoted and referenced Texas proceedings and Texas litigants, and was widely disseminated in Texas, including to Harris County courts and the local patent bar.  A True and accurate copy of the February 2025 Bloomberg Article is attached hereto as **Exhibit A**.

   e.   The coordinated campaign alleged herein was specifically designed to harm a Texas lawyer and Texas law firm and to exclude them from the Texas and national legal

3

markets thereby depriving small patent owners their ability to assert their First Amendment Rights by seeking redress for patent infringement.

11.    Venue is further proper in this Court under 28 U.S.C. § 1391(b)(2) as this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## **FACTUAL BACKGROUND**

### *Plaintiffs' Practice*

12.    Ramey is a Texas lawyer who, through Ramey LLP, represents small patent owners, individual inventors, and patent monetization entities—often on a contingent-fee basis—against some of the largest technology companies in the world.  Many of Plaintiffs' client companies are denied access to the courts because they cannot afford to maintain a patent infringement cause of action.  Ramey has developed, through Ramey LLP, processes and procedures that provide access to the courts for those patent owners who are otherwise unable to afford it.

13.    Patent litigation is extraordinarily expensive, and few firms are willing to represent small patent owners on non-hourly arrangements. Ramey is among the limited number of firms providing this access-to-justice function. Numerous patent owners can attest to this, through sworn declaration.  A copy of the Declaration of Carlos Gorrichategui is attached hereto as **Exhibit B**.

14.    While most firms would accept funded litigation, litigation where the firm is paid regardless of outcome, few litigation funding entities will fund a case unless the potential recovery is a high multiple of the funding expended for the case.  Given that patent infringement litigation costs and attorneys' fees run in the multiples of millions of dollars, a typical funder will require millions of dollars in damages before agreeing to fund a case.  A true and accurate copy of the 2023 AIPLA Report of Economic Survey is attached hereto as **Exhibit C**.

15.     Thus, if a patent owner has a valid and infringed patent where the damages are not many millions of dollars, it is highly unlikely that such patent owner will find a law firm to represent it. Ex. B, ¶¶7-9.  Ramey is one of the few law firms that allows all patent owners with valid and infringed claims to seek redress for patent infringement even if the damages available are not multiples of millions of dollars.

16.     Ramey LLP has developed a business out of helping patent owners monetize their intellectual property in a way that no other law firm has replicated.  The system Ramey LLP has developed seeks and receives a return on their intellectual property.

### *The Coordinated Campaign to Drive Plaintiffs Out of the Market*

17.     Ramey alleges that beginning no later than 2021, certain large technology companies and their aligned "patent defense" organizations—including Unified, RPX, other companies, and their outside counsel—undertook a coordinated campaign to destroy Plaintiffs' professional reputation, interfere with their client relationships, and force Plaintiffs out of the patent-litigation market, thereby attempting to deprive patent owners one of the few attorneys who will take a patent infringement case on a contingent basis when the damages are not in the millions of dollars.

18.     This campaign has included:

    a.  Systematic publication of negative articles and posts about Plaintiffs, including more than 200 RPX "news" items and numerous Bloomberg, Unified and other industry-facing publications, many of which repeatedly associated Plaintiffs with "sanctions," "shoddy work," and "vexatious" litigation;

    b.  Public calls, by Stroud on behalf of Unified Patents, as its General Counsel, and others, for disciplinary action and disbarment of Ramey on LinkedIn and other platforms;

    c.   Mischaracterization and distortion of court records and proceedings to portray Plaintiffs as unethical, incompetent, and habitually sanctioned, even when sanctions were miscounted, contested, or on appeal;

    d.   Behind-the-scenes coordination among defense firms and in-house counsel, as reflected in redacted time records and shared transcripts, to share strategies and costs for sanctions motions and reputational attacks directed specifically at Plaintiffs; and

    e.   Direct interference with Plaintiffs' relationships with existing and prospective clients and litigation funders, including settlement provisions and communications aimed at cutting Plaintiffs out of future work or undermining client confidence in Plaintiffs.

19.    Plaintiffs contend that Defendants' purpose was not limited to lawful competition in defending patent suits, but rather to unfairly eliminate a particular competitor—Ramey LLP—from the market for representing small patent owners, thereby further reducing the already limited pool of firms willing to take contingency-fee patent cases against large technology companies and others when the potential damages are not in the multiple of millions of dollars.  Defendants determined that it would be cheaper to force Ramey from the space rather than litigate the cases, not only seeking to damage Ramey but seeking to deprive numerous patent owners of their First Amendment Rights.

### *The Stroud Article and LinkedIn Publication on behalf of Unified Patents*

20.    Plaintiffs' assert the campaign to drive Ramey from the market began in 2022 with the false publications by Unified and Stroud.

21.    On or about November 15, 2022, Stroud authored, on behalf of Unified Patents, and caused to be published on the "PatentProgress" website (operated by CCIA) an article titled "With

frivolous NPE patent suits clogging courts, counsel's diligence and ethics suffer" (the "Stroud Article.") A true and accurate copy of the Stroud Article is attached hereto as **Exhibit D**.

22.    Patent Progress is an organization based in Washington DC that supports the interests of Big Tech:

23.    Neither Ramey nor anyone else associated with Ramey LLP is a member of Patent Progress. Consequently, Ramey and Ramey LLP were not aware of the Stroud Article until after the February 2025 Bloomberg Article was published.

24.    The Stroud Article purports to discuss allegedly frivolous non-practicing entity ("NPE") litigation and attorneys' ethics. Within that article, Stroud identifies "Exhibit A of this phenomenon" as "William ('Bill') Ramey III," and asserts, among other things, that:

    a.    "He has filed over 300 suits this year alone (through October (in 2022)), almost exclusively in the Western District of Texas's Waco division; in the past ten years, he's filed thousands."

    b.    "A former drunk-driving billboard defense lawyer, he's moved into Waco and is driving the heavy filings there."

    c.    Plaintiffs are part of a "cottage industry" of file-and-settle NPE practices that, if "taken to the extreme (as some have), is bound to violate ethical and court rules," and that "just a handful of lawyers are willing to risk it.

    d.    Further, Stroud has continued to post negative comments, write negative articles, and deliver negative presentations to this day about Ramey and Ramey LLP, even calling for the disbarment of Ramey on such platforms as LinkedIn, Facebook, and the like.

25.    These statements are presented as factual assertions about Plaintiffs and are false or materially misleading. In particular:

   a.  Ramey was never a "drunk-driving billboard defense lawyer." He has not operated a billboard-based DWI or personal-injury advertising practice. Stroud had no factual basis for this biographical claim. It is not couched as hyperbole or metaphor; it is written as a descriptive fact intended to ridicule and diminish Plaintiffs by associating them with a stigmatized, low-brow advertising practice they never engaged in.

   b.  At the time of the Stroud Article, Ramey had not "filed thousands" of patent cases over the prior ten years. While Plaintiffs have filed a significant number of cases, the "thousands" figure is a gross exaggeration used to brand Plaintiffs as extreme outliers. Public docket records show that the true number was substantially less than "thousands," and no more than several hundred.

   c.  Stroud, on behalf of Unified Patents, uses false factual predicates to argue that Plaintiffs "literally do not have the time to conduct reasonable pre-suit diligence on even a fraction of their filings" and to label Ramey as "Exhibit A" of a practice "bound to violate ethical and court rules." This statement is presented as a factual indictment of Plaintiffs' ethics and diligence, not a mere opinion about patent litigation generally.

26.    The Stroud Article places Ramey in a list of entities and counsel that the Article describes as engaging in "frivolous" practices, facially "deficient" complaints, and campaigns resulting in sanctions, bankruptcies, and offshored licensing revenues.

27.    By labeling Ramey as "Exhibit A" of that phenomenon and tying him to examples of patently abusive practices by others, Stroud conveys, as fact, that Plaintiffs are knowingly filing frivolous suits, violating ethical rules, and operating a "sue-and-settle" shakedown business model.

28.    The Article concludes that "what is needed… is some more comprehensive inquiry into the speed and volume of their practices" and that "it's time for the patent bar and state bars to take

notice," explicitly urging bar authorities to take action against lawyers like Ramey. This call to action rests on the false factual statements described above. Exhibit A.

29.    Unified and Stroud continue their false and defamatory publications through an amicus brief filed on August 20, 2024, wherein they repeat their false and misleading statement regarding Ramey and Ramey LLP. A true and accurate copy of the amicus brief is attached hereto as **Exhibit E**.

30.    Additionally, Stroud, on behalf of Unified Patents, published numerous posts to LinkedIn during the course of 2025. True and accurate copies of these LinkedIn posts are attached hereto as **Exhibit F**. Specifically, the LinkedIn posts state:

a.    "Another day, another award. Here, false allegations in the complaint, among with another laundry list of violations. The award this time was $124,000; it is added to more than a dozen, at least three this calendar year. Still in good standing with the bar, still in possession of a USPTO registration number, still no action taken to deter the conduct." *Id*.

b.    "Coming on the heels of a $200k, $100k+, and $90k sanction/fee award in the last few months, this attorney---who is still listed as in good standing with no disciplinary action in Texas and at the USPTO---can add another $45k sanction to the pile. He appeared in 56 matters listing as pro hac in California, and only bothered to actually seek it in 10. Per this order, the attorneys must self report to their own bars (which they are already under an obligation to do). I think we can assume that hasn't been happening. This entire saga demonstrates how toothless bar discipline and ethical enforcement have gotten in patet [sic] law. This has been going on for a decade." *Id*.

     i.    Stroud then commented on this LinkedIn post and stated, "[t]o be clear, this order is limited to the pro hac issue.  There are other sanctions pending in this case related to the repeated baseless filings (there, to be exact) against the same party for the same patent." *Id*.

   c.   "Endlessly fascinating saga right here.  Nineteen awards!" *Id*.

     i.    Stroud tagged the USPTO in response to another LinkedIn user's comment which stated, "[t]he state bar disciplinary authorities need to take a much harder stance against these sort of behaviors." *Id*.

31.    These LinkedIn posts falsely portray the gist that there is a "saga" surrounding Ramey because he continuously violates the rules, is unethical, and apparently does not report to his state bar.

32.    The LinkedIn posts further tagged the United States Patent and Trademark Office ("USPTO") seemingly to infer that readers should report Ramey and/or the USPTO should disbar Ramey due to this alleged "saga."

*** The First Bloomberg Article ***

33.    On or about September 19, 2024, Bloomberg Law published an article titled, "Prolific Patent Attorney Fumbles California Sanctions Hearing" (the "September 2024 Bloomberg Article.")  A true and accurate copy of the September 2024 Bloomberg Article is attached hereto as **Exhibit G**.

34.    The September 2024 Bloomberg Article purports to report on an 80-minute show-cause hearing before Magistrate Judge Peter Kang in *Koji IP LLC v. Renesas Electronics America Inc*., Case No. 3:24-cv-03089 (N.D. Cal.).

35.    The reasonable gist of the September 2024 Bloomberg Article is that:

a. Ramey is a prolific but incompetent and unethical patent attorney who "fumbles" in court under basic questioning;

b. For "seven years" he has knowingly "masterminded more than 50 patent cases in California since 2017" while "litigating without the court's permission," i.e., engaged in a long-running unauthorized-practice scheme;

c. He deliberately ran a "litigation by proxy" model—using Ms. Kalra as a "local proxy"—that "avoided" proper admission requirements for cost reasons;

d. His conduct is so egregious that court staff, attendees, and the judge openly laughed, scoffed, and called the situation "embarrassing;"

e. This conduct sits within a broader pattern of "multiple sanctions" and "sanctions bids" by major technology defendants across the country; and

f. The consequence of this hearing will likely be new sanctions and ethics referrals that "dismantle" his model and bring "comeuppance" for his past misconduct.

36.    The gist is communicated not merely by any one sentence, but by the combination of:

a. A loaded headline ("Prolific Patent Attorney Fumbles California Sanctions Hearing");

b. The narrative that Ramey has "tried cases in California for seven years without a license," "masterminded more than 50 patent cases," and "admitted avoiding temporary admission filings to reduce costs." *Id*.

c. Vivid, derisive scene-setting (attendees "scoffed," "whispered," "stifled laughter," called it "embarrassing"). *Id*.

d. Repeated characterization that the trio has "seemingly adopted this strategy across federal courts in the Northern and Central Districts—litigating without the court's permission." *Id*.

e. A closing flourish that Ramey has "changed [their] practices," "made a mistake," and "it won't happen again," immediately followed by the judge's parting line: "You're always free to take the California bar exam." *Id*.

37. Plaintiffs allege that, under Texas law and the gist doctrine described in *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434–35 (Tex. 2017), this Sanctions Hearing Article is not substantially true and is more damaging to Plaintiffs' reputations than a truthful account of the Koji hearing, the subsequent orders, and the related admission issues.

38. The September 2024 Bloomberg Article repeatedly asserts and implies that Plaintiffs "tried cases" and "litigated without the court's permission" in California "for seven years" as a business model, when in fact:

a. Any admission issues were procedural and tied to signature-block / pro hac vice practices (e.g., use of "pro hac vice anticipated") that the Koji record reflects had already been discontinued by the time of the show-cause hearing; and

b. Plaintiffs expressly told Judge Kang—and later demonstrated in filings—that they had changed their practices once they understood the court's concerns.

39. The September 2024 Bloomberg Article states that "their motion has dismantled Ramey's model, and may yield a comeuppance for the attorney who admitted avoiding temporary admission filings to reduce costs," without accurately reflecting the substance of Ramey's explanation to the court that:

a. The practice was changed immediately upon learning the court objected;

b. The firm did not intend to misrepresent its licensure, and believed its arrangement with California-licensed lead counsel complied with governing rules; and

12

c. The characterization that the firm "avoided" admission filings as a conscious long-term strategy misstates the limited and already-corrected nature of the conduct.

40.    By emphasizing laughter, scoffing, and anonymous comments like "[t]his is embarrassing," the Article goes beyond neutral reporting and is designed to present Ramey as incompetent in front of both the judge and the local bar.

41.    The September 2024 Bloomberg Article then explicitly connects this show-cause hearing to a broader pattern of "multiple sanctions," describing Ramey as "fighting multiple sanctions bids advanced by their cases' defendants in federal courts, including BlackBerry, Volkswagen, and Microsoft," and stating that the show-cause hearing before Judge Peter Kang "may yield a comeuppance" and ethics referrals "across California, Texas, Colorado, and the US Patent and Trademark Office." *Id*.

42.    This framing suggests that sanctions against Plaintiffs are routine and inevitable consequences of their practice and Judge Kang will (and should) join that chorus and punish Plaintiffs as part of a larger, justified backlash.

43.    The September 2024 Bloomberg Article's overall impression is that Ramey is a serial, reckless violator of admission rules whose misconduct warrants sanctions and bar referrals, and that new sanctions from Judge Kang are all but a foregone conclusion. That impression is more severe and more damaging than a truthful report on an 80-minute show-cause hearing about the contested procedural practices.

44.    Bloomberg's true motive for publishing the September 2024 Bloomberg Article is confirmed by the fact that a Bloomberg reporter agreed that the Rule 11 sanctions did not appear proper, but no reporting was made to that effect. A true and accurate copy of this correspondence with a Bloomberg reporter is attached hereto as **Exhibit H**.



45.    Plaintiffs further allege that this negative gist has direct consequences in subsequent sanctions proceedings and judicial decision-making.

46.    Opposing counsel in other cases have already cited or paraphrased the September 2024 Bloomberg Article to argue that Ramey has a "history" of unauthorized practice and sanctions risk, thereby urging other judges to impose sanctions or exceptional-case fees.

47.    The September 2024 Bloomberg Article therefore functions, in practice, as prejudicial "background" evidence against Plaintiffs in every subsequent sanctions motion.

48.    Defendant Bloomberg knew or, at a minimum, should have known that exaggerated, mocking coverage of a pending sanctions matter —without fairly disclosing Plaintiffs' legal position and, later, their Federal Circuit appeal and Emergency Motion to Stay Enforcement of Penal Sanctions—would likely influence how other courts view and treat Plaintiffs in future proceedings.

49.    Nonetheless, Defendant Bloomberg chose to publish and then stand by a narrative whose false gist is that Plaintiffs have "litigated without permission" for years and are now facing an overdue "comeuppance" and inevitable sanctions, thereby exacerbating the already toxic, sanction-laden environment in which Plaintiffs must practice and defend themselves.

### The Second Bloomberg Article

50.    On or about February 24, 2025, Bloomberg published another article titled, "Lawyer Big Tech Loves to Hate Wears Backlash as 'Badge of Honor'" (the "February 2025 Bloomberg Article.")  The February 2025 Bloomberg Article is available online and is widely distributed in

Texas and nationally. It has already been cited by at least one court as a factual source regarding Plaintiffs' practice.

51.    The February 2025 Bloomberg Article purports to be an investigative "deep dive" but largely republishes and amplifies Bloomberg's own talking points and points from other third-parties (including Unified, Google, and defense firms) and makes or endorses numerous false statements about Plaintiffs.  Exhibit A.

52.    Among other things, the February 2025 Bloomberg Article states:

a.    "Ramey LLP is among the most prolific filers of patent infringement lawsuits—about 260 in 2024 across the country. His five-lawyer firm handled at least 25% of patent suits filed in 2024 in the US District Court for the Western District of Texas, one of the busiest US patent courts." *Id.*

b.    "Along the way, he's been admonished by judges for filing frivolous lawsuits and motions, submitting sloppy documents, missing court appearances, and violating court and attorney conduct rules. Judges have granted, fully or partially, at least 19 requests for sanctions and attorneys' fees against Ramey, his firm and/or clients, totaling about $2 million, according to a Bloomberg Law analysis." *Id.*

c.    "Ramey was dogged by accusations of doing shoddy work and flouting rules almost from the firm's inception." *Id.*

d.    "One early client, oil and gas machinery company Array Holdings Inc., described witnessing Ramey's 'gross ineptitude' during a settlement conference." *Id.*

e.    "Ramey and his firm sued without adequately investigating whether clients were properly asserting patent allegations, if the accused product pre-dated the protected

invention, or if clients had the right to sue, according to at least 30 defendants' motions and judges' orders combined." *Id*.

f.  "During the September hearing in Kang's court, Ramey said his firm didn't seek permission to practice in certain courts if the plaintiff was managed by [Carlos] Gorrichategui, in order to save money for the client… Ramey promised the practice would stop." *Id*.

g.  "His firm has received notices about not having permission to practice in the Middle District of North Carolina and the Northern District of Georgia, as well as in California… A judge in the Southern District of New York is considering Google's $124,000 sanction bid that argues Ramey didn't request permission to practice in that court." *Id*.

h.  In connection with a Paycheck Protection Program ("PPP") loan, that "Ramey answered 'no' to a question on a Covid-era Paycheck Protection Program application asking whether the firm's owner was 'subject to an indictment, criminal information, arraignment' or other proceeding," that his bank asserted he "lied," and that "Judge Vanessa Gilmore ruled for the bank, noting that dates for an arraignment were scheduled at the time of the application," followed by the statistic that "more than 160 people were criminally charged with PPP loan fraud" but "Ramey wasn't." *Id*.

i.  It quotes Stroud on behalf of Unified Patents as saying that Ramey is "financially incentivized to not look into his complaints, to file cases against the wrong party, to be sloppy, because he's making more money doing that than being sanctioned," and quotes Stroud that "it's unbelievable that Texas has not openly admonished him or warned him or sanctioned him." *Id*.

16

53.     These statements are false and/or materially misleading and go far beyond merely summarizing court records.  Further, while reporters from Bloomberg did interview several of Ramey and Ramey LLP's clients, the February 2025 Bloomberg Article does not correctly portray their statements.   The attached Declarations of Carlos Gorrichategui, Ph.D., Krishnamurthy Narayanaswamy, Ph.D., Andrew Ling, Luis Ortiz, and Mark Jefferson Reed, describes these inaccuracies.  The Declarations of Krishnamurthy Narayanaswamy, Ph.D., Andrew Ling, Luis Ortiz, and Mark Jerrerson Reed are attached hereto as **Exhibits B, M, N, O, and P**.

54.     Namely, Bloomberg did not report the struggle and abuse to what are subject the small patent owners and/or inventors by the tech giants, their lawyers and their subsidized news outlets. Exhibit A.

55.     The February 2025 Bloomberg Article's assertion that as of the publication date, "[j]udges have granted, fully or partially, at least 19 requests for sanctions and attorney's fees against Ramey, his firm and/or clients, totaling about $2 million, according to a Bloomberg Law analysis" is inaccurate.  Exhibit A.

56.     Plaintiffs' own compiled records show:

    a.  There are not "at least 19" separate granted sanctions motions against Plaintiffs. Bloomberg's number improperly aggregates distinct fee awards, interim rulings, and matters still under appeal or modification and treats them as final, granted sanctions. *Id*.

    b.  Several of the purported "sanctions" are actively contested and not final.  *Id*.

    c.  Bloomberg never provided Plaintiffs with a list of the "19" orders, and Castle did not seek Plaintiffs' verification of that figure before publication.  *Id*.

    d.  Bloomberg does not distinguish between fee-shifting under § 285 and sanctions.  *Id*.

e.  Bloomberg does not disclose that even if considered a sanction in every case, the percentage of cases affected is less than 2 percent which is historically less than the percentage of cases receiving some form of fee award. *Id.*

57.  By using an exaggerated and unsourced "19 sanctions" figure, and coupling it with "totaling about $2 million," the February 2025 Bloomberg Article conveys to courts, clients, and funders that Plaintiffs have been repeatedly and definitively sanctioned for misconduct in a way that is quantitatively and qualitatively untrue. *Id.*

58.  The February 2025 Bloomberg Article states that Plaintiffs have been "admonished by judges for filing frivolous lawsuits and motions, submitting sloppy documents, missing court appearances, and violating court and attorney conduct rules," and that Plaintiffs "were dogged by accusations of doing shoddy work and flouting rules almost from the firm's inception." *Id.*

59.  The February 2025 Bloomberg Article:

a.  Does not identify any court holding that Plaintiffs "frequently" file frivolous lawsuits, as opposed to isolated disputes in a small fraction of cases.

b.  Ignores the hundreds of cases in which there were no findings of frivolousness or sanctions.

c.  Fails to disclose that as of the publication date of the February 2025 Bloomberg Article, many cited sanctions or fee awards are on appeal or not yet reduced to final orders.

60.  The February 2025 Bloomberg Article claims that "Ramey and his firm sued without adequately investigating whether clients were properly asserting patent allegations, if the accused product pre-dated the protected invention, or if clients had the right to sue, according to at least 30 defendants' motions and judges' orders combined." *Id.*  This statement, however, blurs together adversarial motions with actual court findings, implying that there are roughly "30" judicial

determinations of inadequate investigation; fails to distinguish defense rhetoric from actual rulings; and falsely implies that Plaintiffs have a pervasive pattern of violating their duty of reasonable pre-suit investigation.

61.    In reality, Plaintiffs conducted pre-suit investigations in each case. By aggregating motions and a handful of orders into a single "30" figure, Bloomberg misleads readers into believing that Plaintiffs have been found by judges to have repeatedly failed to investigate.

62.    The February 2025 Bloomberg Article further states that Plaintiffs "handled patent infringement lawsuits in California for seven years without being licensed to practice there" and that in a show cause hearing before Judge Kang, "Ramey said his firm didn't seek permission to practice in certain courts if the plaintiff was managed by Gorrichategui, in order to save money for the client," and that "Ramey promised the practice would stop." *Id.*

63.    However, the actual hearing transcript shows that Plaintiffs discontinued the challenged signature-block/pro hac vice practice immediately upon learning of the court's concerns in an August 22, 2024, hearing; that Ramey explained that the firm was waiting to be "further in the case" before seeking pro hac vice, and that cost was not the sole or primary reason in earlier cases (Ex. C at 26:15–23); and that Plaintiffs expressly told the Court that the practice had already stopped upon receiving feedback, and that they did not intend to misrepresent their licensure status. A true and accurate copy of the hearing transcript is attached hereto as **Exhibit I**.

64.    By selectively paraphrasing the hearing transcript and omitting those clarifications, the February 2025 Bloomberg Article falsely suggests that Plaintiffs knowingly practiced without permission "in order to save money for the client," and that they only promised to stop when caught.

65.     The February 2025 Bloomberg Article claims that Plaintiffs' firm "has received notices about not having permission to practice in the Middle District of North Carolina and the Northern District of Georgia, as well as in California," and that "A judge in the Southern District of New York is considering Google's $124,000 sanction bid that argues Ramey didn't request permission to practice in that court."  Exhibit A.

66.     While there have been disputes over admission procedures, the February 2025 Bloomberg Article fails to note that in the Southern District of New York matter, Ramey was or became properly admitted and the principal basis for the fee request was not unauthorized practice and further improperly aggregates assorted "notices" and arguments into a narrative that Plaintiffs routinely and intentionally practice without permission, without acknowledging that in many matters any procedural issues were cured and no court has found that Plaintiffs intentionally committed unauthorized practice.

67.     The February 2025 Bloomberg Article's description of the PPP loan matter is also misleading.  It states that Ramey checked "no" to the PPP criminal history question while criminal charges were pending, that the bank asserted he "lied," and that Judge Gilmore ruled for the bank, with the Fifth Circuit affirming.  *Id*.  It then notes that over 160 people were criminally charged with PPP fraud but "Ramey wasn't."  *Id*.

68.     The February 2025 Bloomberg Article omits that Ramey was never indicted for PPP fraud or any PPP-related offense, the dispute concerned ambiguous PPP form language about being "subject to" an "indictment, criminal information, arraignment or other means" when no arraignment ever occurred as there was no indictment, no criminal PPP prosecution was ever initiated against Ramey, and Ramey has never been subject to an indictment in any matter.

69.    By juxtaposing the PPP litigation with generic PPP-fraud statistics and failing to plainly state that Ramey was never charged, the February 2025 Bloomberg Article invites readers to equate Plaintiffs with PPP fraud defendants.

70.    The February 2025 Bloomberg Article quotes unnamed "legal professionals familiar with Ramey's litigation tactics" who say his "behavior can change" in discovery and that they fear "retaliation," and refers to opposing counsel who complain of "expletive-filled tirades." *Id*.

71.    These anonymous accusations are not tied to specific, verifiable events and were published without adequate disclosure of the basis or any meaningful opportunity for Plaintiffs to respond.

72.    The February 2025 Bloomberg Article then quotes Stroud on behalf of Unified Patents: "He's financially incentivized to not look into his complaints, to file cases against the wrong party, to be sloppy, because he's making more money doing that than being sanctioned." *Id*.  In context, this is a factual accusation of deliberate ethical misconduct—that Plaintiffs consciously choose to file uninvestigated, meritless suits and sue the wrong parties for profit.

73.    Plaintiffs' fee arrangements, as reflected in engagement agreements and sworn testimony, provide that clients retain a share of recoveries, that pre-suit investigations are conducted, and that sanctions impose serious financial burdens on Plaintiffs.

74.    Plaintiffs have not adopted a model that "leaves nothing for the client" or that makes more money from sanctions than from lawful recoveries. Stroud's quoted statement, and Bloomberg's and Unified's endorsement of it, is false and defamatory.

### *The Third Bloomberg Article*

75.    On or about December 18, 2025, Bloomberg Law again reported on Plaintiffs in an article titled "Patent Lawyer Must Get Court's OK Before Filing New Suits" (the "December 18 Bloomberg Article.")  A true and accurate copy of the December 18 Bloomberg Article is attached hereto as **Exhibit J**.

76.    The December 18 Bloomberg Article reports on Judge Alan Albright's sanctions order in *MCom IP LLC v. Cisco Systems Inc.*, No. 6:22-cv-00261 (W.D. Tex.), including a requirement that Ramey obtain advance permission before filing new patent suits in the Western District of Texas and attach the sanctions order to any such complaint.

77.    Ramey provided Bloomberg with a detailed written response, including a copy of his Emergency Motion for Stay of the District Court's Prefiling Injunction Pending Appeal that he planned to file, and did file, in the United States Court of Appeals for the Federal Circuit on December 23, 2025.

78.    The Cisco Sanctions Article does not mention the Emergency Stay Motion, does not disclose that Ramey has appealed the sanctions order and sought an emergency stay of the pre-filing injunction, and does not inform readers that he contests the order's key factual predicates.

### The Fourth Bloomberg Article

79.    Bloomberg additionally published an article titled "Patent Attorney Seeks Sanctions Stay, Citing Reputational Damage" on December 19, 2025 (the "December 19 Bloomberg Article.") A true and accurate copy of the December 19 Bloomberg Article is attached hereto as **Exhibit K**.

80.    The December 19 Bloomberg Article exemplifies the one-sided, prosecution-style reporting that Plaintiffs allege has characterized Bloomberg's campaign against them. While the December 19 Bloomberg Article purports to report on Ramey's emergency stay motion, it fails to fairly present the substance of his legal arguments, omits critical exculpatory evidence, and reinforces the false defamatory gist that Plaintiffs are chronic, sanctions-driven abusers of the patent system. *Id*.

81.    The December 19 Bloomberg Article leaves readers—including judges, potential clients, and funders—with the false impression that Ramey's "dispute" is mere lawyer spin, rather than a documented, record-based challenge to the factual predicate of the sanctions order.

82.    The December 19 Bloomberg Article states, "[t]he judge noted Ramey's litigation history, which includes filing more than 600 patent suits in the Western District since 2021 and is filled with admonishments by federal courts across the country who have sanctioned the attorney, his firm and/or his clients over 20 times." *Id*.

83.    The article does not disclose that 600+ filings over four years, in a district that handles thousands of patent cases, does not by itself prove vexatiousness and the Emergency Stay Motion argues (and Cisco's own briefing concedes) that the number of fee/sanctions awards is less than 1% of Ramey's total filings since 2018.  This leaves readers to assume the "600" figure is inherently abusive.

84.    The "over 20" or "more than 20" sanctions figure is materially misleading because it aggregates fee-shifting under § 285 (which is not a sanction for misconduct) with actual Rule 11 or inherent-authority sanctions, it counts interim rulings, matters on appeal, and disputed awards as if they were final, adjudicated findings of misconduct, it does not distinguish between sanctions against Ramey personally, his firm, or his clients, and many of the cited matters involve routine fee disputes in cases that settled or were voluntarily dismissed.

85.    By uncritically repeating Judge Albright's characterization without disclosing Ramey's documented challenges to it, the December 19 Bloomberg Article reinforces the false gist that Ramey is a serial, adjudicated abuser of the legal system and rules.

86.     The December 19 Bloomberg Article's title, "Patent Attorney Seeks Sanctions Stay, Citing Reputational Damage," trivializes the substance of Ramey's legal arguments by reducing them to a public-relations complaint.

87.     The December 19 Bloomberg Article only states that Ramey "disputed the court's findings" and focuses almost entirely on his concern that the order will cause "reputational damage," "bias judges," and create "malpractice exposure." *Id*.

88.     This framing creates the false gist that Ramey is asking for a stay to protect his image, rather than to prevent enforcement of a sanctions order that he contends (with specific record evidence) is factually and legally erroneous.

89.     The December 19 Bloomberg Article mentions that Ramey "filed a notice of appeal to the US Court of Appeals for the Federal Circuit" but does not explain the basis of the appeal.

90.     By failing to disclose that Ramey has not only appealed but has also planned to file an emergency stay motion with specific documented challenges to the sanctions order, the December 19 Bloomberg Article leaves readers with the impression that the sanctions are final, uncontested, and inevitable.

91.     The December 19 Bloomberg Article failed to report that Ramey's Emergency Stay Motion specifically disputes the "file anything" characterization with record evidence (the amended claim charts), that the "nuisance settlement" narrative is contested and not supported by fully developed findings in the "other cases" cited by the District Court, and that Ramey's fee arrangements (as reflected in engagement agreements and client declarations) provide for clients to retain a share of recoveries and do not incentivize filing meritless cases.

92.     By failing to report these challenges, the December 19 Bloomberg Article allows the "file anything" and "nuisance settlement" narrative to stand unchallenged, reinforcing the false gist that Ramey's business model is inherently abusive.

93.     The December 19 Bloomberg Article states: "The judge noted Ramey's litigation history, which includes filing more than 600 patent suits in the Western District since 2021 and is filled with admonishments by federal courts across the country who have sanctioned the attorney, his firm and/or his clients over 20 times." *Id*.

94.     Judge Albright's perception of Ramey's "litigation history" was likely shaped, at least in part, by:

   a.   The February 2025 Bloomberg Article which asserted "at least 19" sanctions totaling "about $2 million."  Exhibit A.

   b.   The September 2024 Bloomberg Article which predicted "comeuppance" and described Ramey as having been sanctioned in "multiple" jurisdictions.  Exhibit G.

   c.   The December 18 Bloomberg Article which cited and tracked themes from Bloomberg's and Unified's prior publications (e.g., "file anything," "band of merry lawyers," "sanctions are no good deterrent," "clogging the docket.")  Exhibit J.

95.     The December 19 Bloomberg Article selectively quotes from Judge Albright's order which presents a false impression.  Under *Rosenthal* and *Neely v. Wilson*, 418 S.W.3d 52, 63–64 (Tex. 2013), even if individual quotations from a court order are literally accurate, a publication can be actionable if it creates a false overall impression through selective omission of material exculpatory facts.

96.     Here, by quoting the District Court's harshest characterizations while omitting Ramey's specific, record-based refutations, the December 19 Bloomberg Article creates the false gist that

the sanctions are uncontested and fully justified, that Ramey's objections are frivolous or public-relations-driven, and the pre-filing injunction is a routine, uncontroversial response to obviously vexatious conduct.

97.    Bloomberg had in hand, at the time of publication, Ramey's detailed written response to the Cisco sanctions, including a copy of his Emergency Stay Motion.

98.    Bloomberg, however, published an article that reduced Ramey's challenges to a single sentence ("disputed the court's findings") and framed his motion primarily as a complaint about reputation.

### *The Bloomberg Articles as a Whole*

99.    Bloomberg has been publishing the "at least 19" / "over 20" sanctions narrative since February 2025.  Exhibit A, J, K.

100.    Ramey has repeatedly challenged that narrative, providing Bloomberg with a compiled sanctions chart and arguing that the figure is misleading.

101.    Bloomberg has never provided Ramey with a list of the cases underlying its "at least 19" count.  Yet, Bloomberg continues to report the "over 20" figure (now sourced to Judge Albright's order) as if it were established fact, without disclosing that the figure is contested, that it includes non-sanctions fee awards and matters on appeal, and that it represents less than 1% of Ramey's filings.

102.    The February 2025 Bloomberg Article, December 18 Bloomberg Article, and December 19 Bloomberg Article (the "Bloomberg Articles"), taken as a whole, convey the false gist that Ramey is a chronic, sanctions-driven abuser whose objections to the Cisco order are frivolous or reputation-driven, and that the pre-filing injunction is an uncontroversial, fully justified response to obviously vexatious conduct.

103.    Bloomberg Law is a subscription service whose customer base includes in-house counsel at large technology companies—the very entities that benefit from the "sanctions-driven troll" narrative Bloomberg has been publishing.

104.    Bloomberg's reporting aligns with and amplifies the interests of large technology companies and their aligned "patent defense" organizations (Unified, RPX), which have a financial interest in reducing patent enforcement risk by eliminating contingency-fee counsel like Ramey.

105.    This financial alignment, combined with Bloomberg's refusal to fairly report exculpatory evidence, supports an inference of actual malice: that Bloomberg published the false gist through the Bloomberg Articles knowing it was false, or with reckless disregard for the truth, in order to serve the interests of its customer base and sources (Unified, RPX).

### *RPX Articles*

106.    RPX, through its "insight.rpxcorp.com" site, has produced a stream of negative coverage about Plaintiffs since approximately 2021—dozens or hundreds of posts, often several in a single day—repeatedly link Plaintiffs' names with "frivolous suits," "sanctions," and "troll" activity out of proportion to commentary about other firms ("RPX Articles.")  A true and accurate sample of the RPX Articles published throughout 2025 are attached hereto as **Exhibit L**.

107.    The RPX Articles purport to be neutral "case updates" about various matters involving Plaintiffs or clients they represent.  *Id*.  However, through selective topic choice, loaded headings, and repeated, thematically linked descriptions, RPX presents Plaintiffs in a false manner.

108.    As with Unified and Bloomberg, Plaintiffs do not allege that each discrete sentence in the RPX Articles is independently false; rather, under *Rosenthal* and *Neely*, they contend that RPX's selective emphases, omissions, and mocking framing create a cumulative false gist.

109.    Even if some of the referenced orders exist, RPX's decision to saturate its "news" feed with repeated, thematically linked negative coverage of Plaintiffs—while consistently omitting the pendency of appeals, Plaintiffs' legal challenges, and clarifying facts (such as Ramey's non-appearance in certain cases)—means that RPX's publications are more damaging to Plaintiffs' reputations than any hypothetical truthful account based on the same court records would have been. *Id*.

110.    The headline phrase "Requested Nonmonetary Sanction Against 'Ramey and His Band of Merry Lawyers' Taken 'Under Advisement' for More Than Year," prominently quoted and adopted by RPX, frames Plaintiffs as a group of unserious, roguish lawyers for whom sanctions are a running joke, rather than an extraordinary remedy subject to serious legal dispute and appeal. Similarly, RPX's repeated use of phrases like "Ramey Days and Mondays," "Wednesday to Be Another Ramey Day Before Judge Kang," and "Ramey and His Fellow Sanctioned Parties Make a 'Fifth Urgent Plea'" is not neutral reporting; it is editorial ridicule. *Id*.

111.    RPX's coverage selectively emphasizes and repeats the existence of sanctions, fee-shifts, and judicial criticism while omitting the equally material facts that many of those orders are on appeal, subject to motions for reconsideration, or otherwise contested and in at least some of the referenced matters, sanctions were denied (e.g., "Ramey Evades Sanctions" in the AuthWallet / Cullen/Frost Bankers case), or only limited aspects of a broader defense request were granted. *Id*.

112.    By highlighting only the initiation or granting of sanctions and by downplaying dismissals with leave to amend, ordinary litigation outcomes, and Plaintiffs' appeals and stay efforts, RPX constructs a running narrative that sanctions against Plaintiffs are constant, justified, and outcome-defining.

113.    Taking the RPX Articles together, the reasonable gist for a reader of ordinary intelligence in the patent-defense and in-house counsel community is that Ramey and "his band of merry lawyers" are chronic, sanctions-addicted litigators whose practice is built on filing "patchwork" and "objectively weak" cases to extract nuisance settlements, that Plaintiffs repeatedly and knowingly engage in unauthorized practice of law as part of a "cost-cutting" business model, that Plaintiffs are routinely sanctioned, subjected to fee-shifts, and referred to professional-conduct committees, such that sanctions and ethics scrutiny are an ordinary, and expected, and that Plaintiffs objections to these sanctions are meritless attempts to stave off "potentially career ending" but justified consequences, rather than good-faith efforts to correct legal errors and overbroad, penal sanctions.

114.    Plaintiffs allege that this gist is false and is more damaging than a truthful account of the same underlying proceedings would have been.

### *RPX, Unified, Defense Firms, and Coordination*

115.    Stroud, as general counsel of Unified, has been a central figure in the campaign against Plaintiffs. As early as 2022, he began publishing or participating in articles, blog posts, and LinkedIn commentary attacking Ramey as unethical, frivolous, and deserving of disbarment, including the Stroud Article.  Exhibits D, F.

116.    Mr. Ramey and Ramey LLP only learned of these articles after the February 2025 Bloomberg Article was published and research was done to understand the false narrative that Stroud had created.

117.    Stroud on behalf of Unified has repeatedly posted on LinkedIn and elsewhere comments which portray the gist that Ramey should be disciplined or disbarred, that Plaintiffs' cases are

meritless, and that Plaintiffs are sloppy and sue the wrong party while being financially incentivized not to investigate claims. Exhibits D, F.

118.    This pattern of unfair, one-sided reporting—repeated across the Stroud Article, the Bloomberg Articles, and the RPX Articles—demonstrates that Defendants are not engaged in neutral journalism.  Rather, it displays that Defendants are in a coordinated campaign to destroy Plaintiffs' professional reputation and to exclude them from the patent-litigation market.

119.    As a direct and proximate result of Defendants' false statements, coordinated publications, and unfair competition, Plaintiffs have suffered significant injury, including loss of existing clients and matters, including institutional clients who departed after negative media coverage of Ramey, loss of prospective clients who refused to engage Plaintiffs after encountering these publications, denial or loss of litigation funding and financing, with funders expressly citing the negative press and sanctions narrative promoted by Defendants, increased defense and appeal costs in sanctions proceedings, fueled and justified in part by Defendants' false narrative, severe reputational harm within the patent bar, judiciary, and client community, and emotional distress and personal humiliation to Ramey and his family.

120.    Plaintiffs seek actual, general, special, and exemplary damages in an amount within the jurisdictional limits of this Court, to be proven at trial.

## COUNT 1 – DEFAMATION
### LIBEL BY FALSE GIST / LACK OF SUBSTANTIAL TRUTH
### (*Against All Defendants*)

121.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

122.    Plaintiffs bring this defamation claim squarely under the Texas "gist" / substantial-truth framework: even if some discrete statements in Defendants' publications could be characterized

as technically accurate, the publications as a whole convey a false and defamatory gist about Plaintiffs that are more damaging to their reputations than any truthful account would have been.

123.    Plaintiffs are private individuals.

124.    Stroud, on behalf of Unified, published numerous posts to LinkedIn during the course of 2025.  Exhibit F.

125.    These LinkedIn posts convey the false gist that there is a "saga" surrounding Ramey because he continuously violates the rules, is unethical, and apparently does not report to his state bar.  *Id*.

126.    Any "saga" that exists is purely due to the gist that Stroud created and Bloomberg and Unified then continued to spread through subsequent publications.

127.    The LinkedIn posts further tagged the USPTO seemingly to infer that readers should report Ramey and/or the USPTO should disbar Ramey due to this alleged "saga."  *Id*.

128.    Upon information and belief, Stroud tagged the USPTO in his LinkedIn posts to further spread his false "saga" on a large scale.

129.    Bloomberg published the Bloomberg Articles during the course of 2025.

130.    The defamatory gist of the Bloomberg Articles is that Plaintiffs are habitual violators of court and ethical rules, chronically filing frivolous, uninvestigated, and shoddy patent suits, that Plaintiffs' core business model is to file meritless "file-and-settle" cases in high volume, against the wrong parties, with inadequate investigation, knowing they will be sanctioned—but that they are financially incentivized to proceed anyway because the sanctions are outweighed by ill-gotten settlements, that Plaintiffs have been repeatedly and decisively sanctioned—"at least 19" times, totaling about $2 million—in a way that defines their practice, that Plaintiffs have knowingly practiced law without permission in multiple jurisdictions and only stopped when caught, that

Plaintiffs deceived a bank and the government in connection with a PPP loan in a way that closely tracks PPP-fraud prosecutions, and that Plaintiffs are so ethically compromised that it is "unbelievable" the Texas bar has not sanctioned or admonished Ramey, and he should be the subject of bar discipline.  Exhibits A, J, K.

131.    This gist is conveyed not by a single sentence, but by the entire structure, headings, anecdotes, quotes, and juxtapositions of the Bloomberg Articles.

132.    Plaintiffs allege that this gist is false and more damaging than a truthful account would be. By aggregating, selectively quoting, and juxtaposing litigation snippets in this way—rather than fairly presenting the record—the Bloomberg Articles cross the *Rosenthal* line: they goes beyond "minor inaccuracies" and create a false defamatory impression regarding Plaintiffs' ethics and professional competence.

133.    The defamatory gist of RPX Articles is that Plaintiffs are engaged in chronic, habitual rule-breaking and sanctions-driven litigation, that Plaintiffs have definitively engaged in "unauthorized practice of law" in multiple jurisdictions as part of a "cost-cutting scheme," without disclosing that such findings are actively contested on appeal, that Plaintiffs' practice is marked by "patchwork infringement allegations," improper pleadings, and "trouble over the past year or two," implying systemic incompetence rather than isolated disputes in particular cases, that Sanctions against Plaintiffs are routine, inevitable, and fully justified, without fairly reporting that many such orders are on appeal, subject to emergency stay motions, or involve contested legal questions, and that Plaintiffs' objections to sanctions (including "urgent pleas" to the Federal Circuit) are meritless attempts to escape "potentially career ending" but fully deserved consequences.  Exhibit L.

134.    That gist created through the RPX Articles is false and not substantially true.  Many of the sanctions and "unauthorized practice" rulings that RPX treats as final are under active appeal,

subject to emergency stay motions, or otherwise contested.  Plaintiffs discontinued the challenged California "pro hac vice anticipated" signature-block practice immediately after the first hearing. RPX also highlights (e.g., AuthWallet / Cullen/Frost), sanctions against Plaintiffs were denied or complaints were dismissed with leave to amend.  However, these are routine litigation outcomes that do not remotely justify branding Plaintiffs as per se abusive or unethical.

135.    Defendants repeatedly published information regarding sanction requests, orders, and adversarial rhetoric (e.g., "objectively weak claims," "nuisance-value settlements") while omitting pendency of appeals, motions for reconsideration, and Plaintiffs' legal arguments, adversarial accusations (e.g., "pattern of filing lawsuits asserting objectively weak claims to extract nuisance-value settlements") as though they were neutral findings, without clearly identifying them as arguments of the opposing party, and loaded headlines and mocking rhetoric—such as "Ramey and His Band of Merry Lawyers," "Ramey Days and Mondays," and "Wednesday to Be Another Ramey Day Before Judge Kang"—to signal to its audience that Plaintiffs are punch-lines and serial wrongdoers, not simply advocates engaged in contested litigation.

136.    The LinkedIn posts published by Stroud, on behalf of Unified, the RPX Articles, and the Bloomberg Articles create a gist that is more damaging to Plaintiffs' reputations than a truthful account would have been.

137.    The LinkedIn posts published by Stroud, on behalf of Unified, the RPX Articles, and the Bloomberg Articles are plainly "of and concerning" Plaintiffs.

138.    Accusing a practicing lawyer of repeated unethical conduct, habitual violations of admission rules, "unauthorized practice of law," and a business model rooted in sanctions and nuisance-value litigation squarely injures that lawyer "in his office, profession, or occupation" and

is defamation per se under Texas law. *See Hancock v. Variyam*, 400 S.W.3d 59, 63–67 (Tex. 2013); *Lipsky*, 460 S.W.3d at 596.

139.    At a minimum, Defendants acted negligently in publishing this defamatory gist. As a sophisticated, repeat user of patent-litigation dockets and practitioner before federal courts, Defendants knew or should have known that many of the orders they cite are not final, are on appeal, or are subject to stay requests, that Ramey did not appear as counsel of record in at least some of the cases that RPX and Bloomberg portray as part of his supposed "pattern," and that describing adversarial rhetoric as if it were fact, while omitting Plaintiffs' contrary filings, would mislead readers about the true posture and meaning of those proceedings.

140.    In addition, Plaintiffs allege that Defendants acted with actual malice—knowledge of falsity or reckless disregard for the truth—sufficient to support exemplary damages, because they knew that the allegations in the article were false, created a false gist or sting to the article, and showed reckless disregard for the statements made about Plaintiffs.

141.    Plaintiffs also allege that Defendants acted with actual malice because business model is to sell litigation-risk intelligence to the very in-house counsel and defense firms who benefit from a narrative that Plaintiffs are sanction-prone, unethical, and unsafe to hire or fund, creating a financial and competitive motive to paint Plaintiffs in the worst possible light.

142.    Finally, Plaintiffs allege that Defendants acted with actual malice because the mocking tone and repetition of themes ("band of merry lawyers," "Ramey Days and Mondays," "fifth urgent plea") show an intent to ridicule and stigmatize, not to neutrally inform, supporting an inference that Defendants were indifferent to whether their narrative was substantially true.

143.    As a direct and proximate result of Defendants' defamatory publications, Plaintiffs have suffered, and continue to suffer, reputational harm, loss of client and funder relationships,

increased sanctions-related and appellate burdens, and a toxic professional environment in which courts and opposing counsel treat them as pre-branded bad actors.

144.    Defendants are jointly and severally liable for the defamatory publications and Plaintiffs seek all damages–exemplary damages and equitable relief–pleaded in the Prayer as against Defendants.

145.    Plaintiffs therefore seek:

    a.  Presumed general damages for reputational and professional injury;

    b.  Special damages tied to specific lost matters, clients, and funding;

    c.  Damages for increased sanctions-related and appeal costs driven by the toxic narrative;

    d.  Exemplary damages, in light of Defendants' knowing or reckless disregard of the truth and the foreseeably corrosive effect of their publications on Plaintiffs' ability to practice and be fairly heard in court;

    e.  An injunction enjoining Defendants from using confidential settlement terms and coordinated sanctions campaigns solely to exclude Plaintiffs from the market for representing small patent owners; and

    f.  An injunction enjoining direct or indirect interference with Plaintiffs' existing attorney-client relationships through communications that knowingly and falsely impugn Plaintiffs' ethics or competence.

146.    Plaintiffs also seek a declaratory judgment that the identified statements and coordinated conduct constitute defamation, business disparagement, and unfair competition under Texas law.

## COUNT 2
### BUSINESS DISPARAGEMENT
#### (*Against All Defendants*)

147.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

148.    Defendants published false and disparaging statements about Plaintiffs' business and legal services.

149.    Defendants either knew the statements were false or acted with reckless disregard for their truth or falsity, or at a minimum acted with the level of negligence required for business disparagement under Texas law.

150.    Defendants acted with malice in that their primary motivation was to harm Plaintiffs' economic interests and competitive position, not to provide fair or neutral commentary.

151.    As a direct and proximate result, Plaintiffs suffered special damages, including but not limited to specific lost clients, funding refusals, and litigation opportunities that can be proven at trial.

152.    Plaintiffs seek actual damages, exemplary damages, injunctive relief, and all other relief allowed under the law, as alleged herein.

**COUNT 3**
**TORTIOUS INTERFERENCE WITH EXISTING**
**AND PROSPECTIVE BUSINESS RELATIONS**
**(*Against All Defendants*)**

153.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

154.    Plaintiffs had valid contracts and ongoing business relationships with clients, co-counsel, and funders, as well as reasonable probability of entering into additional prospective relationships.

155.    Defendants knew of these relationships or were substantially certain that their actions would interfere with Plaintiffs' ability to maintain and secure such relationships, given the small patent-litigation bar and high visibility of the campaigns.

156.    Defendants intentionally and willfully interfered with existing and prospective relationships by:

a. Publishing and amplifying knowingly false or recklessly false defamatory content targeted at Plaintiffs;

b. Sharing litigation materials and transcripts within networks such as Unified, RPX, and other third-parties to support coordinated sanctions motions and reputational attacks;

c. Using settlement leverage and agreements, including with Google and other third-parties to disrupt or undermine Plaintiffs' relationships with their clients;

d. Encouraging repeated motions for sanctions and attorney's fees directed personally at Plaintiffs beyond what was warranted by the conduct at issue; and

e. Pressuring or encouraging third-party media and blogs to publish negative content about Plaintiffs.

157.    Defendants' interference was independently tortious because it relied upon defamation, business disparagement, and unfair competition.

158.    As a result, Plaintiffs suffered actual damages in lost fees, lost cases, reduced case pipeline, and impaired ability to obtain financing.

159.    Plaintiffs seek actual damages, exemplary damages, injunctive relief, and all other relief allowed under the law, as alleged herein.

### COUNT 4
### COMMON-LAW UNFAIR COMPETITION BY WRONGFUL CONDUCT
### (*Against All Defendants*)

160.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

161.    Under Texas common law, unfair competition encompasses a variety of torts involving wrongful interference with another's business or trade.

162.    Defendants engaged in unfair competition by wrongful conduct in that they:

    a. Combined, coordinated, or acted in concert to employ defamatory publications, sanctions strategies, and bar-complaint rhetoric not for legitimate litigation defense alone, but to exclude Plaintiffs from the patent-litigation market;

    b. Leveraged their dominance and collective resources to saturate the patent-litigation community with a false narrative about Plaintiffs' alleged "shoddy work," "meritless suits," and "ethics" issues, thereby chilling the willingness of clients, co-counsel, and funders to work with Plaintiffs;

    c. Employed deceptive tactics, including miscounting sanctions, misrepresenting hearing outcomes, and selectively quoting or distorting court records; and

    d. Exploited litigation materials obtained in one matter for hostile use in unrelated matters against Plaintiffs, coordinated through networks such as Stroud, Unified, Bloomberg, and RPX.

163. This pattern of behavior goes beyond ordinary competition and constitutes a coordinated scheme to restrain competition by eliminating one of the few firms willing to represent small patent owners on contingent terms.

164. Plaintiffs have suffered substantial damages as a result and are entitled to monetary damages and equitable relief—including injunctive relief preventing further unfair competition through false or misleading statements and coordinated sanctions tactics directed solely at Plaintiffs.

165. Plaintiffs seek actual damages, exemplary damages, injunctive relief, and all other relief allowed under the law, as alleged herein.

### **COUNT 5**
### **CIVIL CONSPIRACY**
### (*Against All Defendants*)

166.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

167.    Defendants, acting individually and through their agents, knowingly agreed and combined to accomplish unlawful purposes, including defamation, business disparagement, and tortious interference, or to accomplish lawful purposes by unlawful means.

168.    There was a meeting of the minds—formal or informal—and coordinated action evidenced by:

    a.   Shared narratives and talking points across publications and platforms;

    b.   Repeated cross-citation and amplification of one another's attacks on Plaintiffs (e.g., the Stroud Article, the Bloomberg Articles, and the RPX Articles RPX repeating the same themes);

    c.   Coordinated use of court filings and hearing transcripts to fuel media attacks and sanctions motions in multiple cases; and

    d.   Common financial and competitive motives to reduce the availability of counsel for small patent owners and thereby reduce patent-enforcement risk for large technology companies.

169.    In furtherance of the conspiracy, Defendants committed one or more overt tortious acts, including the publications and interference described above.

170.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered damages for which each conspirator is jointly and severally liable.

171.    Plaintiffs seek actual damages, exemplary damages, injunctive relief, and all other relief allowed under the law, as alleged herein.

## JURY DEMAND

172.    Plaintiffs demand a trial by jury and tender the appropriate jury fee.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendants be cited to appear and answer and that, upon final trial, the Court grant judgment in favor of Plaintiffs and against Defendants, jointly and severally, for:

1.    Actual damages (general and special) in an amount to be proven at trial;

2.    Lost profits and other economic damages;

3.    Exemplary (punitive) damages;

4.    Pre-judgment and post-judgment interest as allowed by law;

5.    Costs of court;

6.    Temporary and permanent injunctive relief as requested herein; and,

7.    Such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**THE BUCHANAN LAW OFFICE, P.C.**
*/s/ Byron M. Buchanan*
Byron M. Buchanan
State Bar No. 00796268
1002 Gemini, Ste 225C
Houston, TX 77058
Byron@thebuchananlawoffice.com
Telephone:  713-936-0783
Facsimile:  713-583-0444