**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **WILLIAM P. RAMEY, III and RAMEY LLP,** | § § § | |
| | § | CIVIL ACTION NO. 4:26-cv-01462 |
| Plaintiffs, | § | |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| **JONATHAN STROUD; UNIFIED PATENTS, LLC; BLOOMBERG L.P.; and RPX CORPORATION,** | § § § § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS UNIFIED PATENTS, LLC AND JONATHAN STROUD'S MOTION TO DECLARE TDMA REQUEST INSUFFICIENT AND UNTIMELY**

**BUCKINGHAM, DOOLITTLE & BURROUGHS LLC**

/s/ *Andrew C. Stebbins*
Andrew C. Stebbins
(Pro Hac Vice OH#0086387)
1375 East 9th Street, Suite 1700
Cleveland, OH 44114
Email: astebbins@bdblaw.com
Telephone: 216.736.4233
Facsimile: 216.736.4233

**THE BUCHANAN LAW OFFICE, P.C.**

/s/ *Byron M. Buchanan*
Byron M. Buchanan
State Bar No. 00796268
1002 Gemini, Ste 225C
Houston, Texas 77058
Byron@thebuchananlawoffice.com
Telephone: 713-936-0783
Facsimile: 713-583-0444

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. NATURE AND STAGE OF THE PROCEEDINGS ............................................................ 2

III. STATEMENT OF THE ISSUES AND APPLICABLE STANDARD .............................. 3

IV. ARGUMENT AND AUTHORITIES ................................................................................ 4

    A.   Even If the Retraction Request Were Untimely, the DMA Authorizes, at Most, a Narrow, Statement-Specific Loss of Exemplary Damages. .................................................... 4

    B.   The Motion Applies the Wrong Statutory Trigger: Section 73.055(c) Measures the Ninety-Day Period from Knowledge of the Publication, Not the Date of Publication. ...... 6

    C.   As to the August 20, 2024 Amicus Brief, the Motion Fails: Plaintiffs' Knowledge Dates to Late 2025, and the Section 73.055(c) Period Was Satisfied or Remained Open. . 7

    D.   The Exemplary-Damages Question Is Fact-Bound and Premature; It Should Be Denied or Deferred. .............................................................................................................. 9

    E.   Section 73.058 Does Not Authorize a "Sufficiency" Challenge to Publications That, on the Moving Defendants' Own Theory, Were Never the Subject of Any Request. ....... 10

    F.   In the Alternative, the Continuing Publication of the Statements and the Discovery-Rule Exception Confirm That the Exemplary-Damages Question Cannot Be Resolved Now. ............................................................................................................................... 11

V. CONCLUSION AND PRAYER ....................................................................................... 12

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chabot v. Frazier*,
  2025 WL 2164002 (Tex. App. July 30, 2025)...........................................................................10

*Hogan v. Zoanni*,
  627 S.W.3d 163 (Tex. 2021).............................................................................1, 5, 6, 9, 11

*Su v. Gaya Won, LLC*,
  2024 WL 5301787 ..............................................................................................................5

*Velocity Databank, Inc. v. Shell Offshore, Inc.*,
  456 S.W.3d 605 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)...................................11

**Statutes**

Tex. Civ. Prac. & Rem. Code § 73.003(a)(1) .................................................................................10

Tex. Civ. Prac. & Rem. Code § 73.055(a)....................................................................................4

Tex. Civ. Prac. & Rem. Code § 73.055(b)..................................................................................4, 6

Tex. Civ. Prac. & Rem. Code § 73.055(c)...............................................1, 2, 3, 4, 6, 7, 8, 9, 11, 12

Tex. Civ. Prac. & Rem. Code § 73.058(c)..................................................................................4, 10

Texas Defamation Mitigation Act .................................................................................................1

TO THE HONORABLE KENNETH M. HOYT, UNITED STATES DISTRICT JUDGE:

Plaintiffs William P. Ramey, III and Ramey LLP (collectively, "Plaintiffs") file this Response in Opposition to the Motion to Declare TDMA Request Insufficient and Untimely (Dkt. 38) (the "Motion") filed by Defendants Unified Patents, LLC ("Unified") and Jonathan Stroud ("Stroud") (together, the "Moving Defendants"), and respectfully show as follows:

## I. INTRODUCTION

The Motion under the Texas Defamation Mitigation Act (the "DMA" or "TDMA") is premature as the record in this matter has not been developed, and substantial questions remain in regard to Plaintiff's compliance with the DMA.

First, as reference in the Motion, all Defendants in this matter have moved to dismiss Plaintiffs' Complaint on a number of different grounds. At most, an untimely or insufficient retraction request results in the loss of *exemplary* damages. *Hogan v. Zoanni*, 627 S.W.3d 163, 174-177 (Tex. 2021).

Second, the Motion is built on the wrong statutory trigger. Section 73.055(c) measures the ninety-day exemplary-damages period from the date the plaintiff *receives knowledge of the publication*—not from the date the statement was published. The Texas Supreme Court has held precisely this, faulting a lower court for "fail[ing] to give effect to Section 73.055(c)'s focus on knowledge." *Hogan*, 627 S.W.3d at 174. The Motion repeatedly substitutes publication dates— November 15, 2022; August 20, 2024; and unspecified 2025 dates—for the statutory measure, and it never undertakes the knowledge analysis the statute requires.

1

Third, as to Unified's August 20, 2024 amicus brief in particular, the Motion fails on its own terms. Plaintiffs first learned of the amicus brief in late 2025, while researching and preparing this lawsuit. Measured from that knowledge—as Section 73.055(c) requires—the ninety-day period had not run, or had only recently run, when this suit was filed and when the Moving Defendants filed the Motion. A court cannot declare a retraction request "untimely" as to a publication for which the statutory period to make a request was satisfied or remained open.

Fourth, the exemplary-damages question the Motion raises turns on disputed, fact-intensive matters—when Plaintiffs received knowledge of each publication, the continuing publication and accessibility of the statements, and whether the publications form the single coordinated course of conduct alleged in the Complaint. Those questions cannot be resolved on the present record. The Motion should be denied, or the issue deferred until the record is developed.

Plaintiffs do not dispute every point. As to the November 15, 2022 blog post and Stroud's 2025 LinkedIn posts, Plaintiffs candidly acknowledge that their January 23, 2026 retraction letter was not sent within ninety days of their June 2025 knowledge of those publications. But that acknowledgment does not entitle the Moving Defendants to any relief beyond a limit of Plaintiffs' ability to seek exemplary damages for those publications. Every cause of action, and every other category of damages and relief Plaintiffs seek, remains fully intact.

## II. NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed this action on February 23, 2026, asserting claims for defamation, business disparagement, tortious interference with existing and prospective business relations, common-law unfair competition, and civil conspiracy. Dkt. 1. The defamation claim is pleaded under the Texas "gist" and substantial-truth framework and rests on, among other things, three publications attributed to the Moving Defendants: (1) a blog post authored by Stroud and published on

patentprogress.org on November 15, 2022 (the "Blog Post"); (2) an amicus brief filed by Unified on August 20, 2024 (the "Amicus Brief"); and (3) posts authored by Stroud on LinkedIn during 2025 (the "LinkedIn Posts"). Dkt. 1 ¶¶ 20–32, 115–118, 124–128.

All Defendants moved to dismiss on May 6, 2026. Dkt. 30 (RPX); Dkt. 32 (Bloomberg); Dkt. 33 (Unified and Stroud). The Moving Defendants filed the present Motion on May 15, 2026. They concede the Motion becomes moot if their motion to dismiss is granted. Mot. at 2.

On January 23, 2026, Plaintiffs' counsel sent Unified a written request for correction, clarification, or retraction under Section 73.055 (the "Retraction Letter"). Mot. Ex. 1. Unified responded on February 10, 2026, declining the request. Mot. Ex. 2.

As set out in the accompanying Declaration of William P. Ramey, III ("Ramey Declaration," attached as Exhibit 1): Plaintiffs are not members of, contributors to, or subscribers to the patentprogress.org website and did not monitor it; Plaintiffs first learned of the Blog Post and the LinkedIn Posts in June 2025; and Plaintiffs first learned of the Amicus Brief in late 2025, in the course of researching and preparing this lawsuit, the drafting of which did not begin before late November 2025. Ramey Decl. ¶¶ 3–7.

### III. STATEMENT OF THE ISSUES AND APPLICABLE STANDARD

1. Whether the Motion should be denied to the extent it seeks relief broader than a narrow, statement-specific limitation on the recovery of exemplary damages, where the DMA authorizes no dismissal and does not affect actual, general, or special damages.

2. Whether the Motion fails because it measures the Section 73.055(c) ninety-day period from the date of publication rather than from the date Plaintiffs received knowledge of each publication, as the statute requires.

3. Whether, as to the August 20, 2024 Amicus Brief, the Moving Defendants can obtain a declaration of untimeliness where Plaintiffs' knowledge dates to late 2025 and the Section 73.055(c) period was satisfied or remained open.

4. Whether the exemplary-damages question should be denied or deferred as premature, where it depends on disputed, fact-intensive matters not resolvable on the present record.

5. Whether a Section 73.058 challenge to the "sufficiency" of a retraction request can lie against publications that, on the Moving Defendants' own theory, were never the subject of any request.

The DMA provides that a person may maintain a defamation action only if the person made a "timely and sufficient request" for a correction, clarification, or retraction, or the defendant has made one. Tex. Civ. Prac. & Rem. Code § 73.055(a). A request is "timely" if made within the limitations period. *Id.* § 73.055(b). Separately, "if not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages. *Id.* § 73.055(c). A defendant challenging the sufficiency or timeliness of a request must state the challenge in a motion served not later than the 60th day after the date of service of the citation. *Id.* § 73.058(c).

## IV. ARGUMENT AND AUTHORITIES

**A.      Even If the Retraction Request Were Untimely, the DMA Authorizes, at Most, a Narrow, Statement-Specific Loss of Exemplary Damages.**

The Moving Defendants ask the Court to "declare" the Retraction Request "insufficient and untimely" and to bar Plaintiffs from recovering exemplary damages. Mot. at 1–2, 6. But to the extent the Motion suggests any broader consequence—any effect on Plaintiffs' claims or on

4

Plaintiffs' recovery of actual, general, or special damages—it is contrary to the statute and to controlling Texas Supreme Court authority.

In *Hogan v. Zoanni*, the Texas Supreme Court squarely rejected the argument that a plaintiff's failure to provide a timely or sufficient request supports dismissal of a defamation claim. The Court held that "the DMA prescribes the abatement of claims and loss of exemplary damages, rather than dismissal," and that reading a dismissal remedy into the statute would "neuter[] the statute's intentional scheme." 627 S.W.3d at 165, 173–76. The Court emphasized that the Legislature "prescribed a loss of exemplary damages, depending on what a defendant may prove, not dismissal." *Id.* at 172. The DMA, in other words, is a notice-and-mitigation statute; it is not a claim-dispositive mechanism.

The Moving Defendants' own authority confirms the point. In *Su v. Gaya Won, LLC*— submitted by the Moving Defendants at Tab 2 of their Index of Unpublished Cases—the court applied *Hogan* and held that "[t]he appropriate remedy for failure to timely provide a sufficient request is not dismissal, but loss of exemplary damages." *Su v. Gaya Won, LLC,* 2024 WL 5301787, at *21. The Moving Defendants thus cite, and rely on, the very decision that defeats any reading of the Motion as a vehicle for dismissal or for limiting Plaintiffs' non-exemplary recovery.

Two consequences follow. First, whatever the Court does with the Motion, all five of Plaintiffs' causes of action—defamation, business disparagement, tortious interference, unfair competition, and civil conspiracy—remain intact, as do Plaintiffs' claims for actual, general, and special damages and for injunctive and declaratory relief. The DMA reaches none of those. Second, any limitation the Court might impose under the DMA for failure to provide a sufficient request must be confined to exemplary damages. The Court should therefore deny the Motion to

the extent it seeks any relief broader than a narrow, statement-specific limitation on exemplary damages.

**B.    The Motion Applies the Wrong Statutory Trigger: Section 73.055(c) Measures the Ninety-Day Period from Knowledge of the Publication, Not the Date of Publication.**

The Motion's timeliness argument rests on a misreading of the statute. Section 73.055 contains two distinct timing provisions, with two distinct measuring points. Subsection (b) addresses whether a plaintiff may "maintain" the action: a request is "timely" for that purpose if made within the limitations period. Tex. Civ. Prac. & Rem. Code § 73.055(b). Subsection (c) addresses exemplary damages and is measured differently: the ninety-day period runs from the date the plaintiff receives knowledge of the publication. *Id.* § 73.055(c). The Motion conflates the two, treating the limitations period and the date of publication as if they governed the exemplary-damages question. They do not.

The Texas Supreme Court has expressly held that Section 73.055(c) turns on knowledge, not publication or limitations. In *Hogan*, the Court faulted the court of appeals for tying the exemplary-damages analysis "to the limitations period," explaining that the lower court thereby "failed to give effect to Section 73.055(c)'s focus on knowledge." *Hogan,* 627 S.W.3d at 172. The Court continued: "While a plaintiff's ability to seek exemplary damages very well may end before the limitations period, it could also extend *beyond* the limitations period depending on when the plaintiff learned of the publication and what the defendant can prove about that matter." *Id.* The statute thus "contemplated that a plaintiff could provide a sufficient request beyond the limitations period." *Id.*

The Motion never performs the knowledge analysis the statute requires. It asserts that the Retraction Request is untimely because it was sent "well after the statute of limitations period" for

the Blog Post and the Amicus Brief, Mot. at 4–5, and "long after the 90 days expired" for the LinkedIn Posts, Mot. at 5—but it measures all of this from publication dates, not from the date Plaintiffs received knowledge. The limitations cases the Motion invokes for accrual—*Tu Nguyen v. Duy Tu Hoang* and *Sorcic v. International Ass'n for Financial Planning*—address when a defamation *cause of action* accrues for the one-year limitations period. They do not address Section 73.055(c)'s separate, knowledge-based exemplary-damages trigger, which is a creature of the statute's text. Because the Motion is built on the wrong measuring point, it cannot support the relief it requests on the showing it makes.

This distinction underscores the premature nature of the request by Defendants. The issue of the limitation period has been briefed in the various Motions to Dismiss filed by the Defendants in this matter. At minimum, the Motion should be deferred until such time that the Court has ruled on the Motions to Dismiss and decided on the limitations period for the publications in question.

Plaintiffs are candid with the Court about what this does and does not establish. As to the Blog Post and the LinkedIn Posts, Plaintiffs received knowledge in June 2025, and the January 23, 2026 Retraction Letter was not sent within ninety days of that knowledge. Ramey Decl. ¶¶ 4, 6. Plaintiffs do not contend otherwise. The point of this Section is narrower but dispositive of the Motion as framed: the Moving Defendants have not analyzed—and on this record cannot establish—the statutory question the DMA actually poses, and their publication-date theory is the wrong one as a matter of law.

**C.**      **As to the August 20, 2024 Amicus Brief, the Motion Fails: Plaintiffs' Knowledge Dates to Late 2025, and the Section 73.055(c) Period Was Satisfied or Remained Open.**

The Amicus Brief requires separate treatment, because the knowledge-based analysis the statute commands produces a different result for it than for the Blog Post and the LinkedIn Posts.

7

Plaintiffs first became aware of the Amicus Brief in the course of researching and preparing this lawsuit. Ramey Decl. ¶ 6A. The drafting of the Complaint did not begin before late November 2025. *Id.* Plaintiffs' knowledge of the Amicus Brief therefore necessarily falls within the period from late November 2025 through January 2026.

That timing is dispositive in Plaintiffs' favor on the Motion's timeliness theory. Whatever the precise date within that window, it is necessarily within ninety days of the January 23, 2026 Retraction Letter: the earliest possible point in the window—late November 2025—is itself fewer than ninety days before January 23, 2026. The Section 73.055(c) knowledge analysis as to the Amicus Brief thus does not depend on fixing an exact date, because every date in the possible range satisfies the ninety-day requirement. The exemplary-damages bar of Section 73.055(c) was, accordingly, not triggered as to the Amicus Brief.

Plaintiffs are candid about the limits of this point. The Retraction Letter is captioned to the Blog Post and does not by name mention the Amicus Brief. Plaintiffs do not ask the Court to find that the letter, by its terms, separately itemized the Amicus Brief. The Amicus Brief argument does not depend on that. It rests on the statute: measured from knowledge, as Section 73.055(c) requires, the period for a request as to the Amicus Brief was satisfied or open, and the Moving Defendants cannot obtain a declaration of untimeliness as to a publication for which the clock had not run. At the very least, the date Plaintiffs received knowledge of the Amicus Brief is a disputed fact question that cannot be resolved on this record and that independently defeats the Motion as to that publication. *See* Part D, *infra*.

**D.      The Exemplary-Damages Question Is Fact-Bound and Premature; It Should Be Denied or Deferred.**

Even where the DMA may ultimately limit exemplary damages, the question is not suited to resolution on the present record. The Section 73.055(c) analysis the statute requires is inherently fact-intensive, and the Texas Supreme Court has recognized as much: "Knowledge can be difficult to prove." *Hogan*, 627 S.W.3d at 172. Whether and when a plaintiff received "knowledge of the publication" is a factual inquiry, and the statute makes the exemplary-damages consequence depend on "what the defendant can prove about that matter." *Id.*

Several disputed, fact-dependent questions bear directly on the Motion and cannot be resolved now: (1) the dates on which Plaintiffs received knowledge of each of the three publications, and the circumstances of that discovery; (2) the continuing publication and public accessibility of the Blog Post and the LinkedIn Posts; and (3) whether the Blog Post, the Amicus Brief, and the LinkedIn Posts form the single, coordinated course of conduct that the Complaint alleges. Dkt. 1 ¶¶ 17–19, 115–118. Each of these matters would, on a developed record, inform the per-publication knowledge analysis Section 73.055(c) demands. None can be determined on a Rule 12-stage record.

The Moving Defendants themselves recognize the Motion's contingent posture: they concede it "shall become moot if their pending motion to dismiss is granted." Mot. at 2. The prudent course is the converse as well. The Court should deny the Motion, or defer the Section 73.055(c) question, rather than enter a premature, damages-limiting declaration before the record on knowledge and on the course of conduct has been developed. Nothing is lost by deferral: the DMA preserves the Moving Defendants' ability to raise a plaintiff's failure to provide a timely or

9

sufficient request as a matter in mitigation of damages, on a full record. *See* Tex. Civ. Prac. & Rem. Code § 73.003(a)(1).

**E.  Section 73.058 Does Not Authorize a "Sufficiency" Challenge to Publications That, on the Moving Defendants' Own Theory, Were Never the Subject of Any Request.**

The Motion's sufficiency argument is internally inconsistent. The Moving Defendants do not contend the Retraction Letter was insufficient as to the Blog Post; their sufficiency challenge is directed only at the Amicus Brief and the LinkedIn Posts. Mot. at 5. But the Moving Defendants' own position is that Plaintiffs "never sent Defendants a retraction request for any statements made in the amicus brief or LinkedIn posts" at all. Mot. at 4. Those two positions cannot both yield the relief requested. Section 73.058 authorizes a motion "to declare the request insufficient or untimely." Tex. Civ. Prac. & Rem. Code § 73.058(c). There is no "request" to declare "insufficient" as to a publication for which, by the Moving Defendants' own account, no request was ever made. A sufficiency challenge presupposes a request; the Moving Defendants cannot simultaneously contend that no request exists and that the non-existent request was deficient. The sufficiency challenge as framed should be denied.

To the extent the Moving Defendants suggest the DMA required Plaintiffs to send a separate, discretely captioned letter for every publication, the statute imposes no such rule. See, e.g., *Chabot v. Frazier*, 2025 WL 2164002, at *3, *11 (Tex. App. July 30, 2025) (holding that a letter identifying the nature of the defamatory statements and demanding retraction – without cataloging every statement – "was sufficient to meet the requirements of the DMA"). Section 73.055(d) defines a sufficient request by its content; it does not mandate one letter per statement, or that each individual statement be identified, and it does not foreclose a single request addressed to a coordinated course of conduct. The Complaint alleges that the Blog Post, the Amicus Brief,

10

and the LinkedIn Posts are components of one coordinated campaign by the same defendants against the same plaintiffs. Dkt. 1 ¶¶ 17–19, 115–118. Whether the Retraction Letter is properly read against that backdrop, and what the DMA required in these circumstances, are questions that should not be resolved on the abbreviated record now before the Court.

**F.     In the Alternative, the Continuing Publication of the Statements and the Discovery-Rule Exception Confirm That the Exemplary-Damages Question Cannot Be Resolved Now.**

Two further considerations, pleaded in the alternative, reinforce that the Motion should be denied or deferred rather than granted on the present record.

First, the Blog Post and the LinkedIn Posts have remained continuously published and publicly accessible online. Ramey Decl. ¶ 8. The DMA's separate Section 73.055(c) contains a knowledge trigger, which the Texas Supreme Court has since confirmed turns on when the plaintiff learned of the publication. *Hogan*, 627 S.W.3d at 172-174. The continuing public availability of the statements is relevant context for the knowledge inquiry and underscores why a fixed publication-date rule is not the correct measure under Section 73.055(c).

Second, the discovery-rule exception. Texas courts recognize that the discovery rule can apply to a defamation claim where the defamatory statement is "inherently undiscoverable" or is "not a matter of public knowledge." *Velocity Databank, Inc. v. Shell Offshore, Inc.*, 456 S.W.3d 605, 609 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Plaintiffs acknowledge that *Velocity Databank* held the discovery rule unavailable where the statements appeared on a publicly accessible, no-charge website operated by a federal agency, reasoning that such statements were "public knowledge." 456 S.W.3d at 609–11. But that holding was tethered to its facts. Regardless,

11

this issue is being briefed through the Defendants' various Motions to Dismiss and this Motion should be deferred until such time that the Court has ruled on those Motions.

## V. CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiffs respectfully request that the Court DENY the Motion to Declare TDMA Request Insufficient and Untimely. In the alternative, Plaintiffs request that the Court defer ruling on the Section 73.055(c) exemplary-damages question until the record has been developed. To the extent the Court grants any relief, Plaintiffs request that such relief be limited to the recovery of exemplary damages and to the specific statements for which the Court finds a compliant request was not made, and that the Court expressly confirm that all of Plaintiffs' causes of action and all claims for actual, general, and special damages and for injunctive and declaratory relief remain unaffected. Plaintiffs further request all other relief, at law or in equity, to which they may be justly entitled.

Dated: May 28, 2026.

Respectfully submitted,

**BUCKINGHAM, DOOLITTLE & BURROUGHS LLC**

/s/ *Andrew C. Stebbins*
Andrew C. Stebbins
(Pro Hac Vice OH#0086387)
1375 East 9th Street, Suite 1700
Cleveland, OH 44114
Email: astebbins@bdblaw.com
Telephone: 216.736.4233
Facsimile: 216.736.4233

**THE BUCHANAN LAW OFFICE, P.C.**

/s/ *Byron M. Buchanan*

12

Byron M. Buchanan
State Bar No. 00796268
1002 Gemini, Ste 225C
Houston, Texas 77058
Byron@thebuchananlawoffice.com
Telephone: 713-936-0783
Facsimile: 713-583-0444

**ATTORNEY FOR PLAINTIFFS**
**WILLIAM P. RAMEY, III AND RAMEY LLP**

13

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2026, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will serve notice of such filing on all counsel of record in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of Texas.

/s/ *Andrew C. Stebbins*
Andrew C. Stebbins

14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIAM P. RAMEY, III and RAMEY LLP,** | § § § § § § § § § § § § § | |
| Plaintiffs, | | CIVIL ACTION NO. 4:26-cv-01462 |
| v. | | JURY TRIAL DEMANDED |
| **JONATHAN STROUD; UNIFIED PATENTS, LLC; BLOOMBERG L.P.; and RPX CORPORATION,** | | |
| Defendants. | | |

### ORDER

Before the Court is the Motion to Declare TDMA Request Insufficient and Untimely (Dkt. 38) filed by Defendants Unified Patents, LLC and Jonathan Stroud, and Plaintiffs' Response in Opposition. Having considered the Motion, the Response, the record, and the applicable law, the Court is of the opinion that the Motion should be, and hereby is, **DENIED**.

It is so **ORDERED**.

SIGNED on _____, 2026.

_____
KENNETH M. HOYT
UNITED STATES DISTRICT JUDGE
4936-8849-0416, v. 1

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **WILLIAM P. RAMEY, III and RAMEY LLP,** | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:26-cv-01462 |
| **JONATHAN STROUD; UNIFIED PATENTS, LLC; BLOOMBERG L.P.; and RPX CORPORATION,** | § § § § § § | |
| Defendants. | § § | |

**INDEX OF UNPUBLISHED CASES IN OPPOSITION OF DEFENDANTS UNIFIED PATENTS, LLC AND JONATHAN STROUND'S MOTION TO DELACRE TDMA REQUEST INSUFFICIENT AND UNTIMELY**

| Tab 1 | *Chabot v. Frazier*, No. 05-24-01272-CV, 2025 WL 2164002 (Tex. App.--Dallas July 30, 2025) |
|---|---|
| Tab 2 | *Su v. Gaya Won, LLC*, No. CIVIL ACTION H-23-3215, 2024 WL 5301787 (S.D. Tex. Dec. 23, 2024) |

4936-8849-0416, v. 1

16

# TAB 1

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)

2025 WL 2164002

2025 WL 2164002
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Paul CHABOT, Appellant
v.
Frederick FRAZIER, Appellee

No. 05-24-01272-CV
|
Opinion Filed July 30, 2025

**On Appeal from the 429th Judicial District Court, Collin County, Texas, Trial Court Cause No. 429-04031-2024**, Honorable Jill Willis, Judge

**Attorneys and Law Firms**

Daniel J. Hall, Christopher D. Kratovil, Cliff P. Riley, for Appellee.

Tony K. McDonald, Steven E. Ross, Connor Ellington, for Appellant.

Before Justices Smith, Kennedy, and Lewis

**MEMORANDUM OPINION**

Opinion by Justice Lewis

**\*1  Affirmed in Part, Reversed in Part, and Opinion Filed July 30, 2025**

In this accelerated appeal, appellant Paul Chabot appeals the denial of his motion to dismiss appellee Frederick Frazier's defamation claims under the Texas Citizens Participation Act (TCPA). [1] He also challenges the trial court's conclusion that the TCPA motion was frivolous or solely intended to delay and its granting of Frazier's request for attorney's fees. For the following reasons, we affirm the denial of the TCPA motion and reverse the portion of the order granting Frazier's request for attorney's fees.

**BACKGROUND**

Because the underlying facts are well-known to the parties, we include only those necessary for disposition of this appeal. TEX. R. APP. P. 47.4. Frazier is a former officer with the Dallas Police Department. Chabot is a former law enforcement officer and naval intelligence commander. In 2022, Frazier and Chabot were opponents in the Republican primary race for the Texas House of Representatives seat in the 61st District for Collin County. Chabot lost to Frazier in a runoff election. During the course of that election season, Chabot accused Frazier of removing some of Chabot's campaign signs and posing as a code enforcement officer to force management at three McKinney businesses—a Neighborhood Walmart, the TeaLatte Bar, and a RaceTrac fuel station—to remove the Chabot signs posted near the businesses or on their property. Chabot's accusations led to criminal investigations by the McKinney Police Department and the Texas Rangers, Frazier's arrest for criminal mischief, and indictments against Frazier for impersonating a public servant.

The criminal mischief charge arose from Chabot's complaint to McKinney police on December 10, 2021, accusing Frazier of cutting the zip ties anchoring a Chabot campaign sign to a t-post outside of a McKinney 7-Eleven and throwing the sign on the ground. Frazier was charged with Class C Misdemeanor Criminal Mischief in the City of McKinney Municipal Court. He pleaded guilty to the charge on December 8, 2023, and paid a $279.00 fine.

On June 23, 2023, Frazier was indicted on two counts of third degree felony impersonating a public servant related to charges that he instructed an employee of a McKinney Neighborhood Walmart and the owner of the TeaLatte Bar to remove Chabot's campaign signs from those businesses' property. Following the indictments, the DPD placed Frazier on administrative leave and launched an internal investigation.

On December 5, 2023, Frazier pleaded nolo contendere to the two charges of impersonating a public servant. His plea agreement reduced the charges to the lesser-included offense of attempting to impersonate a public servant. He was sentenced to one year deferred adjudication community supervision and ordered to pay restitution of $78.00 and nearly $8,000 in fines.

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 22 of 50

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)

2025 WL 2164002

Frazier resigned from the DPD effective December 8, 2023, after twenty-eight years with the department. At that time, the DPD's Internal Affairs Division had a pending investigation of Frazier arising from Chabot's accusations. On December 9, 2023, the DPD listed his discharge as "dishonorably discharged" on the legislatively-mandated F-5 Separation of Licensee Form. Dallas Deputy Police Chief Monique Alex informed Chabot that Frazier received a dishonorable discharge because he elected to retire while under investigation. Frazier appealed the dishonorable discharge to the Texas Commission on Law Enforcement.

**\*2** On April 25, 2024, the trial court released Frazier from probation on the attempted impersonation charges and dismissed those charges. Frazier and the DPD settled his appeal of the dishonorable discharge and, on May 8, 2024, his discharge from the DPD was officially changed to a general discharge by the Texas Commission on Law Enforcement. Frazier sought reelection in 2024 and faced two challengers for the Republican nomination in the March 2024 primary. Chabot was not one of those challengers. Frazier was defeated in the May 28, 2024 primary runoff election, and his term ended December 31, 2024.

## THE UNDERLYING PROCEEDING

The underlying proceeding arose from incidents that occurred in 2023 and 2024. In December 2023, Chabot formed Collin County Citizens for Integrity PAC (the PAC), a political action committee that Chabot told the trial court had "the purpose of defeating Frazier in the [2024] Republican primary." Chabot also launched a website, www.FireFrazier.com, [2] which was paid for by the PAC. According to Chabot, the website was created "in support of Frazier's political opponent," on which he "posted a comprehensive library of official news documents and news articles documenting Frazier's criminal proceedings and related matters" including "facts pertaining to" Frazier's defamation suit.

One of the articles posted on the website was titled "North Texas State Lawmaker to be Dishonorably Discharged from DPD After 'No Contest' Plea" and was originally published by the Dallas Morning News (DMN) on December 4, 2023. A second article, titled "North Texas state representative will be dishonorably discharged from Dallas Police Department; pleads 'no contest' to misdemeanor charges," was originally published by WFAA TV on its website, WFAA.com, on

December 5, 2023. Both articles reported Frazier's "no contest" pleas to two misdemeanor charges of attempting to impersonate a public servant and the punishment of deferred adjudication probation and fines. Both articles also stated Frazier would receive a dishonorable discharge because he chose to retire while under investigation. The December 2023 DMN article also reported that a Texas Commission on Law Enforcement spokesperson confirmed to the newspaper "that a dishonorable discharge is visible to a subsequent agency when making hiring decision[,]" and that "[a] second such discharge could result in more serious consequences for Frazier's law enforcement license." Both articles also referenced Frazier's guilty plea to Class C Misdemeanor criminal mischief and online payment of the fee. In the present suit, Frazier presented evidence in opposition to the TCPA motion showing that Chabot posted those articles on the FireFrazier website on July 8, 2024, and then modified the posts on the website on September 4, 2024.

Frazier also presented evidence that WFAA published an article on May 9, 2024, titled "State Rep. Frederick Frazier discharged from probation, charges of impersonating public official dismissed." On May 16, 2024, WFAA updated the article to clarify that the charges against Frazier for impersonating a public servant were dismissed and his discharge from the DPD had been "re-designated to a general discharge" following the dismissal of the charges against him. Chabot did not post the 2024 WFAA article on the website.

The website included other posts by Chabot asserting Frazier had been convicted of three offenses. For example, the website includes the following text next to a blurry screenshot of a man purported to be Frazier at a gas station:

> **\*3** In yet another criminal matter, McKinney PD identified Frazier, seen in the grey shirt, lying to the gas station staff to take down another one of his opponent's campaign signs. This is the third recorded location where Frazier was found on video. In all, he received 3 convictions.

Similarly, Chabot shared an excerpt from the Register of Actions from one of the impersonation cases showing the adjudication of guilt had been deferred. However, Chabot titled the excerpt "Frazier Conviction 3." Chabot titled a

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 23 of 50

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)

2025 WL 2164002

similar excerpt "Judge Finds GUILT on Frazier in State/ Texas Ranger Case." The website shows that those excerpts were created on February 14, 2024, and then modified on September 4, 2024.

Chabot admits that during the 2024 runoff election, he printed and placed campaign yard signs around polling places that said: "FIRE FRAZIER," "CONVICTED," "LIED TO VOTERS," and "DISHONORABLY DISCHARGED." Jason Moyer, Frazier's Chief of Staff, testified below that he observed Chabot placing those signs at polling locations "near high-traffic areas" in McKinney on May 27, 2024. [3] Moyer described the signs as depicting Frazier "in a jail or prison cell and stated that he was 'convicted' and 'dishonorably discharged.' "

On May 9, 2024, Frazier's counsel sent Chabot a cease-and-desist letter. In it, counsel stated that Chabot had published statements indicating that Frazier "has been 'convicted' and is 'dishonorably discharged'." Counsel informed Chabot that those statements were "incorrect and are defamatory" to Frazier, and that "all criminal charges that were pending in Collin County District Court against Rep. Frazier have been dismissed" and Frazier "is not dishonorably discharged and is eligible for rehire as a law enforcement officer." Counsel then demanded that Chabot "immediately retract and remove, as applicable, all emails, mailers, signs, advertisements, and other materials containing these defamatory statements" and "issue a public retraction and correction in the same medium and manner as your defamatory statements were made." Chabot did not take the actions requested, and Frazier filed the underlying defamation suit against Chabot on June 25, 2024. Chabot filed a TCPA motion to dismiss, which the trial court denied by written order dated October 25, 2024 (the October 25 Order). This appeal followed.

## THE TCPA AND STANDARD OF REVIEW

The TCPA protects citizens who petition or speak out on matters of public concern from retaliatory lawsuits intended to silence them. *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). That protection comes in the form of a motion to dismiss for a suit that appears to stifle the defendant's exercise of those rights. *Id.*; *Ladiwalla as Tr. of ZAL Tr. v. Bhojani as Tr. Protector of ZAL Tr.*, No. 05-24-01107-CV, 2025 WL 1547744, at *4 (Tex. App.— Dallas May 30, 2025, no pet. h.) ("The primary feature of the TCPA is a burden-shifting dismissal framework that allows

defendants at an early stage to seek dismissal of a meritless suit in response to a defendant's exercise of a protected right.").

A TCPA motion to dismiss generally requires a three-step analysis. *Montelongo v. Abrea*, 622 S.W.3d 290, 299 (Tex. 2021). First, the TCPA movant bears the initial burden of demonstrating that the legal action is based on or in response to the movant's exercise of a protected right, such as the right of free speech, the right to petition, or certain other protected conduct. TEX. CIV. PRAC. & REM. CODE § 27.005(b); *see also Brenner v. Centurion Logistics LLC ex rel. Centurion Pecos Terminal LLC*, No. 05-20-00308-CV, 2020 WL 7332847, at *3 (Tex. App.—Dallas Dec. 14, 2020, pet. denied) (mem. op.) (holding amendments to TCPA do not change burden of "preponderance of the evidence" established by *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017)). Second, if the movant carries his burden, then the burden shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of the claim in question. TEX. CIV. PRAC. & REM. CODE § 27.005(c). Third, even if the nonmovant carries his step-two burden, the court must still dismiss the "legal action" if the defendant "establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d); *Montelongo*, 622 S.W.3d at 296.

**\*4** We review de novo the trial court's determinations that the parties met or failed to meet their respective burdens under the TCPA. *Garcia*, 663 S.W.3d at 279 (citing *Vaughn-Riley v. Patterson*, No. 05-20-00236-CV, 2020 WL 7053651, at *2 (Tex. App.—Dallas Dec. 2, 2020, no pet.) (mem. op.)). In conducting this review, we consider, in the light most favorable to the nonmovant, the pleadings and any supporting and opposing affidavits and other evidence stating the facts on which the claim or defense is based. *Temple v. Cortez Law Firm, PLLC*, 657 S.W.3d 337, 342–43 (Tex. App.— Dallas 2022, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE § 27.006(a). However, the plaintiff's pleadings are generally "the best and all-sufficient evidence of the nature of the action." *Hersh*, 526 S.W.3d at 467.

## ANALYSIS

On appeal, Chabot challenges the denial of his TCPA motion and the award of fees to Frazier. In his first two issues, Chabot argues the trial court erred by denying the motion because

Case 4:26-cv-01462 Document 41 Filed 05/28/26 in TXSD Page 24 of 50

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)
2025 WL 2164002

(1) Frazier failed to present a prima facie case of defamation; and (2) Chabot established defenses to the defamation claims, including that Frazier is a libel-proof plaintiff and that he failed to comply with the Defamation Mitigation Act. In his third issue, Chabot maintains the attorney's fees awarded to Frazier should be reversed because Chabot's TCPA motion was neither frivolous nor solely intended to delay. We address each issue in turn.

## I. TCPA Step Two – Prima Facie Case of Defamation

The parties do not dispute Chabot met his initial burden of demonstrating that Frazier's claims are based on or in response to Chabot's exercise of a protected right. We, therefore, begin our analysis at TCPA Step Two.

The elements of defamation include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *In re Lipsky*, 460 S.W.3d at 593–94; *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 146 n.7 (Tex. 2014). The status of the person allegedly defamed determines the requisite degree of fault. *In re Lipsky*, 460 S.W.3d at 593. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *WFAA–TV, Inc.*, 978 S.W.2d at 571. Frazier and Chabot agree that Frazier was required to show Chabot acted with actual malice here. As for damages, a plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se. *Id.* (citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 162 n.7). Frazier contends the defamatory statements were defamatory per se and, therefore, damages are presumed.

Accordingly, to prove a prima facie case of defamation in this case, Frazier was required to show the following: (1) Chabot published a false statement of fact to a third party, (2) the statement was defamatory concerning Frazier, (3) Chabot acted with actual malice, and (4) the defamatory statements are defamatory per se. Under this record, we conclude Frazier met his burden of proof under TCPA Step Two.

### A. Chabot published a false statement of fact to a third party.

In his original petition, Frazier pleaded multiple statements he contends were false statements of fact published by Chabot that constitute defamation. Those statements included Chabot's assertions that Frazier was "dishonorably

discharged" from the DPD and "convicted" of multiple crimes. The statements pleaded by Frazier were purportedly published between 2022 and 2024, with certain purported publications occurring after Frazier filed the defamation suit in June 2024.

**\*5** In the trial court and on appeal, Frazier focused his prima facie case analysis on statements made by Chabot beginning in May 2024: (1) that Frazier was dishonorably discharged from the DPD, and (2) that Frazier was found guilty and convicted on charges of attempting to impersonate a public servant. The evidence showed those statements were included on the signs Chabot placed outside polling locations in May 2024, and in the December 2023 DMN and WFAA.com articles posted by Chabot on the website in July 2024 and September 2024.

Chabot contends Frazier "abandoned his pleaded claims in favor of new ones" when he responded to the TCPA motion because Frazier focused on statements made beginning in May 2024. According to Chabot, to avoid dismissal, Frazier was required to present a prima facie case as to each allegedly defamatory statement asserted in his petition. This is incorrect.

The TCPA provides for dismissing a "legal action." TEX. CIV. PRAC. & REM. CODE § 27.005(b). Courts cannot dismiss a fact or facts. Rather, courts dismiss claims, causes of action, cases, and lawsuits. *See, e.g.*, TEX. R. CIV. P. 91a.1, 162, 163. The TCPA enables a claimant to avoid dismissal by establishing "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE § 27.005(c). "While this provision indisputably requires the claimant to submit evidence of facts, the facts themselves are meaningless and cannot prevent dismissal unless they sufficiently establish 'each essential element of the claim.' " *Montelongo*, 622 S.W.3d at 301 (quoting TEX. CIV. PRAC. & REM. CODE § 27.005(c)); *see also* TEX. CIV. PRAC. & REM. CODE § 27.006(c) (in seeking or opposing a TCPA dismissal, the parties must rely on the pleadings and evidence "stating the facts on which the liability or defense is based").

Here, the legal action pleaded by Frazier is defamation. The factual allegations in his pleadings and response to the TCPA Motion and the evidence of those factual allegations are the means by which Frazier seeks to establish each element of the defamation claim. In the trial court, Frazier focused his prima facie analysis on defamatory statements made beginning in

2025 WL 2164002

May 2024 and argued those statements alone established a prima facie case of defamation. We, therefore, focus our analysis on those allegations to determine whether he made a prima facie case on each element of the defamation claim.

### 1. The statements

Frazier argues Chabot made false statements beginning in May 2024 that Frazier was dishonorably discharged from the DPD and was found guilty and convicted on charges of attempting to impersonate a public servant. Those statements included Chabot posting the December 2023 DMN and WFAA.com articles on the website in July 2024 and then modifying the posts in September 2024. Frazier also contends the signs posted by Chabot outside polling locations in May 2024 falsely accused him of being dishonorably discharged and being convicted of attempting to impersonate a public servant.

### 2. Falsity of the statements

We conclude the evidence was sufficient to constitute a prima facie showing that the statements were false. The 2023 DMN and WFAA.com articles that Chabot posted on the website reported Frazier's "no contest" pleas to two misdemeanor charges of attempting to impersonate a public servant and the punishment of deferred adjudication probation and fines. Both articles also stated Frazier would receive a dishonorable discharge because he chose to retire while under investigation. By the time Chabot posted the articles in July 2024, however, the presumed outcomes in those original reports had not been realized. In April 2024, the trial court released Frazier from probation on the attempted impersonation charges and dismissed those charges. He was, therefore, never convicted of those charges. And Frazier's discharge was officially designated a general discharge on May 8, 2024.

**\*6** Chabot also made those false statements on the signs he posted outside polling locations during the May 2024 runoff election. Those signs had the words "FIRE FRAZIER," "CONVICTED," "LIED TO VOTERS," and "DISHONORABLY DISCHARGED" over a picture of Frazier depicting him in a jail or prison cell. The evidence showed, at a minimum, that Chabot posted those signs on May 27, 2024, after the charges were dismissed and the discharge designated as general.

Chabot contends the signs with "CONVICTED" were referencing his Class C misdemeanor conviction and were, therefore, true. Frazier argues that Chabot's publication of false statements on the website related to the disposition of Frazier's charge for the attempted impersonation of a public servant serves as circumstantial evidence that Chabot's statement on his campaign signs also referred to the attempted impersonation of a public servant. We agree with Frazier that the circumstantial evidence raises at least a fact issue and supports the finding that Frazier established a prima facie case of falsity. *See Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 800 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) (a plaintiff is permitted to rely on circumstantial evidence to demonstrate a prima facie case of defamation) (citing *In re Lipsky*, 460 S.W.3d at 589).

Reviewing the evidence in the light most favorable to Frazier, we conclude he presented a prima case that the statements were false when published by Chabot.

### 3. Publication to third parties

Next, we address whether the statements were published to third parties. Defamatory statements are "published" if they are communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017); *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.); *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex. App.—Dallas 1986, no writ).

The statements on signs placed outside of polling locations in an election where Frazier was on the ballot meet that definition. Those statements were published to third parties by virtue of their location. Even the trial judge admitted that he saw the signs while serving as a visiting judge in Collin County and noted that "you couldn't miss the signs" in Collin County "because they are very prevalent."

The same is true of the December 2023 DMN and WFAA.com articles Chabot posted on the website. While the forward-looking assertions in the articles were not necessarily false when written, they were false at the time republished (without update) by Chabot. The fact that Chabot did not author the words of the articles is not a defense in the defamation context. *See Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex.

2013) (first citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 386 (1973) (noting that a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own"), then citing Restatement (Second) of Torts § 578 (1977) ("[O]ne who repeats or otherwise republishes defamatory material is subject to liability as if he had originally published it.")). Further, the content Chabot posted on the website was intended to be viewed by third parties. Indeed, according to a Facebook post by Chabot on February 5, 2024, his website had been viewed over 100,000 times since its December 2023 launch. Under this record, we conclude that the statements constitute publications for purposes of the TCPA and were published to third parties.

**\*7** Chabot contends Frazier's claims for defamation relating to Chabot's republication of the December 2023 DMN and WFAA.com articles are barred by section 230 of the Communications Decency Act (the CDA). *See* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."). The statute defines an " 'interactive computer service' " as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet[.]" *Id.* § 230(f)(2). Simply put, the CDA generally bars defamation and libel claims against an entity that merely passively permits the publishing (or, here, the republishing) of another's content. *GoDaddy.com, LLC v. Toups*, 429 S.W.3d 752, 755 (Tex. App.—Beaumont 2014, pet. denied). Chabot maintains that the website is a provider of an interactive computer service as defined by the CDA, that the content at issue was provided by another information content provider, and Frazier's allegations improperly seek to treat Chabot as a publisher of the content posted on the website.

Frazier argues that Chabot is not entitled to immunity for his publication of the 2023 WFAA.com article because Chabot did not act neutrally when he republished the article under the headline "Collin County Rep. Fred Frazier Dishonorably Discharged from DPD" after he had been informed of the article's inaccuracies and after WFAA had published an updated and corrected article. Frazier asserts that instead Chabot acted as an information content provider by republishing the article. [4]

Under the limited record here and viewing the evidence in the light most favorable to Frazier, we conclude Chabot did not establish as a matter of law immunity under the CDA.

### 4. Conclusion

For the foregoing reasons, we conclude Frazier established a prima facie case of the first element of defamation (i.e. the publication of false statements of fact to a third party).

### B. The statement was defamatory concerning Frazier

Frazier was next required to prove the statements were defamatory. Whether a communication is defamatory is in the first instance a legal question for the court. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013). A statement is defamatory only if it is reasonably capable of a defamatory meaning. *Id.* (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)); *see also* RESTATEMENT (SECOND) OF TORTS § 614, cmt. b (noting that it is for the court to decide "whether the communication was reasonably capable of conveying the particular meaning, or innuendo, ascribed to it by the plaintiff" and "whether that meaning is defamatory in character"). A defamatory statement is a statement of fact about a person that tends to diminish the plaintiff's reputation. *See Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418–19 (Tex. 2020); *Hancock*, 400 S.W.3d at 63 (defining defamation "as the invasion of a person's interest in her reputation and good name"); RESTATEMENT (SECOND) OF TORTS § 559 (a defamatory statement is one that "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.").

**\*8** Here, statements that Frazier was "found guilty" and "convicted" of attempted impersonation of a public servant and received a "dishonorable discharge" from the DPD were directly aimed at tarnishing Frazier's reputation and by their very nature are statements that tend to harm a person's reputation. The decision to publish those statements during the primary runoff election and the placement of the signs outside polling locations was intended to deter third persons (i.e., voters) from voting for Frazier and tended to lower his reputation in the community. We conclude this evidence constituted a prima facie case that the statements were defamatory as to Frazier. *See Clark v. Jenkins*, 248 S.W.3d 418, 437 (Tex. App.—Amarillo 2008, pet. denied)

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)

2025 WL 2164002

(statements that a member of the city council was convicted of a felony were defamatory).

### C. Chabot acted with actual malice

"Actual malice" means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *In re Lipsky*, 460 S.W.3d at 593 (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000)). Here, the evidence showed that the website was dedicated to publishing information about Frazier to discredit him and convince voters to support candidates opposing Frazier's bid for reelection. The news articles, court documents, videos, and investigative reports published on the website nearly all relate to the charges arising from the 2022 election season and Frazier's retirement from the DPD. In the May 9, 2024 cease-and-desist letter, Frazier's counsel notified Chabot that all criminal charges in the Collin County District Court had been dismissed and he "is not dishonorably discharged and is eligible for rehire as a law enforcement officer." The letter also informed Chabot that any statements published by Chabot that Frazier "has been 'convicted' and is 'dishonorably discharged' " are incorrect and defamatory to Frazier. Despite this information, on May 16, 2024 Chabot posted a link to the website, which Chabot titled "NEW: Frazier admits GUILTY in just released court doc received May 16 2024." The linked document, however, was the December 5, 2023 plea documents in the TeaLatte case, not a new admission or conviction. The trial court could reasonably view the timing of the post and Chabot's misleading title as evidence that Chabot acted with knowledge of its falsity or with reckless disregard for its truth when he posted the document.

The evidence also shows that Chabot posted the signs at polling locations that stated Frazier was convicted and dishonorably discharged after the cease and desist letter. Even after Frazier sued him for defamation on June 25, 2024, Chabot did not remove the documents from the website. Instead, in July 2024, he found the December 2023 DMN and WFAA.com articles online and posted them to the website. The website shows they were then modified in September, which resulted in the documents moving to the top of the website's file links. The timing of these posts—after the cease-and-desist letter and the filing of the lawsuit—alone establishes a prima facie case of actual malice. The same websites on which Chabot found the December 2023 articles and various court documents he posted also had newer documents and articles confirming Frazier was not convicted on attempting to impersonate a public servant charges and

received a general discharge from the DPD. Yet, Chabot chose to publish the older article and documents rather than the May 2024 corrected WFAA.com article and updated court documents. This evidence is sufficient to establish a prima facie of actual malice. *See Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) ("evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice").

### D. The statements were defamatory per se.

**\*9** Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *Hancock*, 400 S.W.3d at 63–64. If the statements are defamatory per se, a plaintiff may recover general damages without proof of any specific loss. *Id.* at 65. "Historically, defamation per se has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish." *Id.* at 63–64 (citations omitted). Statements that injure a person in his office, profession, or occupation constitute defamation per se. *Id.* at 66. A statement that injures a person in his profession is a statement that "ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, whether honorary or for profit." *Id.* at 66–67 (quoting RESTATEMENT (SECOND) OF TORTS § 573). The defamatory statement must accuse the professional of "lacking a peculiar or unique skill that is necessary for the proper conduct of the profession" to constitute defamation per se. *Id.* at 67.

Statements that Frazier was found guilty and convicted of a crime for which the charges were dismissed are defamatory per se. *See, e.g., Clark*, 248 S.W.3d at 437 (finding that the statement that a city council member was a convicted felon was defamatory per se); *see also Brock v. Tandy*, No. 02-08-00400-CV, 2009 WL 1905130, at \*4 (Tex. App.—Fort Worth July 2, 2009, pet. denied) (mem. op. on reh'g) ("[A]s Tandy was a public official at the time, the statements must be of such character that, if they were true, would have subjected her to removal from office, to criminal charges, or to imputation of official dishonesty or corruption."); *Bentley*, 94 S.W.3d at 582 ("Accusing a public official of corruption is ordinarily defamatory per se."); *Brasher v. Carr*, 743 S.W.2d 674, 677 (Tex. App.—Houston [14th Dist.] 1987) ("Statements that are of such a character as, if true, would subject a public official to removal from office or charge him

with a crime are libelous per se."), *rev'd on other grounds*, 776 S.W.2d 567 (Tex. 1989). Statements that Frazier was dishonorably discharged are defamatory per se because they adversely reflect on his fitness to conduct his business, both as a police officer and as an elected official. *See Hancock*, 400 S.W.3d at 66.

Under this record, we conclude Frazier presented sufficient evidence to show a prima facie case of each element of his defamation claim. We overrule Chabot's first issue.

## II. TCPA Step Three – Affirmative Defenses

Having concluded Frazier showed a prima facie case of defamation, the burden shifted to Chabot to establish an affirmative defense to the defamation claim as a matter of law. On appeal, Chabot maintains he established two affirmative defenses as a matter of law. We disagree.

### A. Libel-proof plaintiff doctrine

Chabot first argues he established that Frazier's claims are barred because he is a libel-proof plaintiff. According to Chabot, Frazier's criminal mischief charge, impersonating a public servant indictments, dishonorable discharge, and placement on the *Brady* list were widely publicized and, therefore, "Frazier's reputation was ruined by his own crimes—not by any statements Chabot published about those crimes or their consequences." That alleged conduct, however, does not support application of the libel-proof plaintiff doctrine.

"A libel-proof plaintiff is one whose reputation on the matter at issue is so diminished that, at the time of an otherwise libelous publication, it could not be damaged further." *Bui Phu Xuan v. Fort Worth Star-Telegram*, No. 02-06-00206-CV, 2007 WL 530078, at *2 (Tex. App.—Fort Worth Feb. 22, 2007, pet. denied) (mem. op.) (first citing *McBride v. New Braunfels Herald-Zeitung*, 894 S.W.2d 6, 9 (Tex. App.—Austin 1994, writ denied); and then citing *Langston v. Eagle Publ'g Co.*, 719 S.W.2d 612, 621 (Tex. App.—Waco 1986, writ ref'd n.r.e.)). Courts have found the doctrine particularly suitable when plaintiffs who are notorious for past criminal behavior assert that they have been libeled by communications charging them with identical or similar behavior. *McBride*, 894 S.W.2d at 9. To justify applying the doctrine, the evidence of record must show not only that the plaintiff engaged in criminal or antisocial behavior in the past, but also that his activities were widely reported to the public. *Id.* at 10.

**\*10** For example, in *Bui Phu Xuan*, the Second Court of Appeals applied the libel-proof plaintiff doctrine to a plaintiff whose "reputed Asian gang membership was widely reported by the Star-Telegram as early as 1994" and was introduced by the State during his 1998 murder trial. *Bui Phu Xuan*, 2007 WL 530078, at *2. The court held that "Bui's reputation was so diminished that it could not have been injured further as a result of the 2005 Star-Telegram articles that again referred to Bui's reputed gang membership-even if the statements were not true." *Id.* The court affirmed the trial court's order granting the Star-Telegram summary judgment on the ground that Bui was libel-proof. *Id.*

Similarly, in *Finklea v. Jacksonville Daily Progress*, the Twelfth Court of Appeals concluded Finklea was not injured by false statements accusing him of crime where he had at least eight convictions for "burglary, theft, and drug possession spanning the last quarter century." 742 S.W.2d 512, 517–18 (Tex. App.—Tyler 1987, writ dism'd w.o.j.). In light of his prior involvement with drugs and burglary, the court concluded that "the effect of the statements on Finklea's reputation is utterly inconsequential. It is impossible to envision a Texas jury awarding him any damages." *Id.* The *Finklea* court noted, however, that "the doctrine should have only a limited application" because "[t]here are few so impure that cannot be traduced." *Id.* at 516 (further noting that "most cases invoking the doctrine narrow its application to those instances in which the challenged statement erroneously describes behavior similar or identical to that for which the plaintiff has been conclusively shown to be guilty.").

The *McBride* court reached a different result. In *McBride*, the New Braunfels Herald–Zeitung printed an article reporting that McBride had been arrested and charged with an aggravated robbery that occurred at the Lone Star Ice House. 894 S.W.2d at 7–8. The article included Comal County Sheriff Lieutenant Rubio's statement that McBride "got away with approximately $1,700 in cash and cigarettes .... We believe that there was someone else with him." *Id.* at 9. McBride sued the newspaper for libel because he maintained that the district attorney dropped the charge against him and he was released from jail twenty-three days after the arrest. *Id.* at 7–8. In its motion for summary judgment, the newspaper argued that, even if the challenged statement was false, it could not have damaged McBride's reputation because McBride was libel proof as a matter of law. *Id.* at 9. On appeal, McBride argued the evidence was insufficient to support a finding that he was libel-proof as a matter of law. *Id.* The Third Court of Appeals agreed and held the evidence did not justify applying

2025 WL 2164002

the libel-proof plaintiff doctrine to McBride. *Id.* at 10–11. Not only was there no evidence concerning any publicity received about McBride's previous convictions for theft, burglary, and delivery of hydromorphone, but the court "could not say that his criminal history is so extreme that no reasonable person could find further damage to his reputation by the false accusation of a new robbery." *Id.* The court reversed the summary judgment "[b]ecause the newspaper failed to establish that, as a matter of law, McBride's reputation could not have suffered from the article's publication[.]" *Id.* at 11.

Unlike the plaintiffs in *Bui Phu Xuan* and *Finklea*, [5] the only evidence that could be construed as past criminal or antisocial behavior by Frazier, separate from the alleged dishonorable discharge and felony indictments, was his conviction of Class C misdemeanor criminal mischief. The record includes no other evidence of past criminal convictions or past criminal or antisocial behavior. A single conviction of a Class C misdemeanor is not the type of notorious past criminal behavior for which the libel-proof plaintiff doctrine applies. We cannot say that his criminal history is so extreme that no reasonable person could find further damage to his reputation by false accusations that he was convicted of two felony charges and dishonorably discharged by the DPD. Under this record, we conclude Chabot failed to establish as a matter of law the applicability of the libel-proof plaintiff doctrine here.

### B. Defamation Mitigation Act
**\*11**   Next, Chabot contends Frazier's claims must be dismissed because he did not comply with the Defamation Mitigation Act. *See* TEX. CIV. PRAC. & REM. CODE §§ 73.051–.062. A person may maintain an action for defamation only if the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant, or the defendant has made a correction, clarification, or retraction. TEX. CIV. PRAC. & REM. CODE § 73.055(a). A request under the Defamation Mitigation Act is timely if it is made during the limitations period. *Id.* § 73.055(b). A request under the Defamation Mitigation Act is sufficient if it is (1) served on the publisher, (2) made in writing, reasonably identifies the person making the request, and is signed by the individual claiming to be defamed or by the person's authorized attorney or agent; (3) states with particularity the statement alleged to be false and defamatory; (4) alleges the defamatory meaning of the statement; and (5) specifies the circumstances causing a defamatory meaning of the statement if it arises from something other than the express language of the publication. *Id.* § 73.055(d). The Defamation Mitigation

Act is to be liberally construed. *Id.* § 73.051. The purpose of the Defamation Mitigation Act is not to provide defendants with a way out of lawsuits, but to provide a person who is defamed by a publication an opportunity to mitigate any perceived damage or injury. *Id.* § 73.052.

Here, Frazier's cease and desist letter was sufficient to meet the requirements of the Defamation Mitigation Act. Moreover, dismissal is not the remedy for the failure to comply with the Act. Rather, a defendant's remedy is to seek abatement of the proceeding no later than the 30th day after a defendant files his answer. *Id.* § 73.062(a). Chabot did not request an abatement and, therefore, did not meet the requirements for obtaining an abatement under the Defamation Mitigation Act.

Under this record, we conclude Chabot failed to establish either affirmative defense as a matter of law and, therefore, did not meet his burden under the third step of the TCPA analysis. The trial court, therefore, did not err in denying the motion to dismiss. We overrule Chabot's second issue.

### III. Attorney's Fees
In his third and final issue, Chabot challenges the trial court's granting of Frazier's request for attorney's fees under section 27.009(b) of the TCPA. TEX. CIV. PRAC. & REM. CODE § 27.009(b). We review a trial court's decision to award fees under section 27.009 for an abuse of discretion. *Doe v. Cruz,* 683 S.W.3d 475, 502 (Tex. App.—San Antonio 2023, no pet.). "A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without regard to guiding principles." *Id.*

Here, the October 25 Order states that Frazier's request for attorney's fees pursuant to section 27.009(b) is granted. Chabot contends this was error because Frazier conceded below that his claims were subject to the TCPA, and the trial court did not make the required findings that the TCPA was frivolous or solely intended to delay. Frazier insists the trial court did not abuse its discretion by granting the fees request because Chabot asserted "baseless arguments" for why the statements were not defamatory. Frazier also contends the TCPA does not require a trial court to make an affirmative finding that the TCPA motion was frivolous or solely intended to delay.

A court may award court costs and reasonable attorney's fees to the party responding to a TCPA motion to dismiss "if the court finds" that the motion "is frivolous or solely intended to delay[.]" TEX. CIV. PRAC. & REM. CODE § 27.009(b).

Those findings are a required prerequisite to an award of fees to the nonmovant. *See Cruz v. Van Sickle*, 452 S.W.3d 503, 525 (Tex. App.—Dallas 2014, pet. denied) ("although an award of reasonable attorney's fees incurred is mandatory for a successful movant, a fee award to a successful respondent is completely discretionary and ***requires a finding the motion was frivolous or solely intended to delay***.") (emphasis added); *see also Weller v. MonoCoque Diversified Ints., LLC*, No. 03-19-00127-CV, 2020 WL 3582885, at *5 (Tex. App.—Austin July 1, 2020, no pet.) (mem. op.) ("an award to a successful respondent is discretionary even if the trial court ***makes the required findings*** that the motion was frivolous or solely intended to delay.") (emphasis added). Here, the trial court did not give a reason for its decision to grant the request for fees and made no findings in the October 25 Order or elsewhere in the record. Without making the required findings, the trial court abused its discretion by granting Frazier's request for fees.

 **\*12** Moreover, even if we imply the required findings here, we conclude the trial court abused its discretion. "Frivolous" is not defined in the TCPA, but "the word's common understanding contemplates that a claim or motion will be considered frivolous if it has no basis in law or fact and lacks a legal basis or legal merit." *Pinghua Lei v. Nat. Polymer Int'l Corp.*, 578 S.W.3d 706, 717 (Tex. App.—Dallas 2019, no pet.) (quoting *Sullivan v. Tex. Ethics Comm'n*, 551 S.W.3d 848, 857 (Tex. App.—Austin 2018, pet. denied) (internal quotations and citations omitted)). Frazier and Chabot agree that Frazier's defamation claim is subject to the TCPA because it is based on or is in response to Chabot's exercise of the right of free speech. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b)(1)(A). While we have, for the reasons given above, concluded Frazier presented a prima facie case of defamation and Chabot did not establish an affirmative defense as a matter of law, we do not think it reasonable under these facts to conclude that the motion was frivolous. *See* TEX. CIV. PRAC. & REM. CODE § 27.009(b); *see also Sullivan*, 551 S.W.3d at 857-58 (overturning attorney's fees award because

the court could not conclude as a matter of law that appellant's motion entirely lacked a basis in law or fact or that "delay was the only factor"). [6]

We also cannot say the TCPA motion was filed for the purpose of causing delay. Chabot filed his TCPA motion thirty-four days after filing his original answer; a hearing on the motion was set within sixty days of the motion; and the trial court decided the matter within ninety days—all reasonable time periods within statutory deadlines. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.003(b), 27.004(a), 27.005(a). Under those circumstances and without any evidence of Chabot's intent in filing the motion being "solely" for the purpose of delay, a finding of such an intent to delay would be an abuse of discretion. *See Cruz*, 683 S.W.3d at 502 (abuse of discretion where TCPA motion filed in a timely manner, and the hearing was held and the decision issued within the statutory deadlines).

For these reasons, we hold the trial court abused its discretion in granting Frazier's request for attorney's fees. We sustain Chabot's objection to the fees order and reverse that portion of the October 25 Order granting Frazier's request for fees.

## CONCLUSION

The trial court did not err by denying Chabot's TCPA motion to dismiss. However, the trial court erred by granting Frazier's request for attorney's fees pursuant to section 27.009(b) of the Texas Civil Practice and Remedies Code. Accordingly, we reverse the portion of the October 25, 2024 order granting Frazier's request for attorney's fees, affirm the order in all other respects, and remand this cause to the trial court for further proceedings consistent with this opinion.

**All Citations**

Not Reported in S.W. Rptr., 2025 WL 2164002

---

**Footnotes**

1      TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011.

2      We will refer to FireFrazier.com as the website.

Chabot v. Frazier, Not Reported in S.W. Rptr. (2025)
2025 WL 2164002

3    The primary election was held on March 5, 2024, but the primary runoff election took place on May 28, 2024.

4    An "information content provider" is defined by the CDA to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Where a defendant contributes to and shapes the content of the information at issue, there is no immunity under the CDA. *F.T.C. v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *6 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009) (citing *Ben Ezra, Weinstein and Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n. 4, 986 (10th Cir.2000) (noting that defendant who participates in the creation or development of information will not be immune from liability)).

5    Chabot also cites *Swate v. Schiffers*, 975 S.W.2d 70, 77–78 (Tex. App.—San Antonio 1998, pet. denied) to support his arguments. *Swate*, however, is distinguishable because there, unlike here, the plaintiff's past criminal, quasi-criminal, and antisocial behavior was extensive and highly-publicized. *Id.* at 74, 77 (holding the plaintiff's reputation "was so deplorable" and could not be further damaged by the challenged news article in light of evidence of twenty-four newspaper articles and three disciplinary orders from the Texas and Louisiana boards of medical examiners that described the plaintiff's medical practice, his prior litigation involving that practice, and various instances of misconduct).

6    Further, we note that by applying the TCPA three-step process to determine whether Chabot's TCPA motion to dismiss should have been granted or denied, we have not resolved any disputed facts. *Cruz*, 683 S.W.3d at 502–03; *Davis*, 2020 WL 5491201, at *12 (reiterating court's TCPA determination "is not a merits determination").

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

2024 WL 5301787
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Sung Jin SU, Plaintiff / Counter-Defendant,
v.
GAYA WON, LLC, World Kuk Sool Association, Inc, and WKSA, LLC, Defendants / Counter-Plaintiffs / Third-Party Plaintiffs,
v.
Alex Paul and Chris Pak, Third-Party Defendants.

Civil Action H-23-3215
|
Signed December 23, 2024

**Attorneys and Law Firms**

Alexander Patrick Paul, Attorney at Law, Oakland, CA, for Plaintiff/Counter-Defendant.

Nathan Allan Wesely, Martin, Disiere, Jefferson & Wisdom, LLP, Houston, TX, for Defendant/Third-Party Plaintiff/Counter-Plaintiff Gaya Won, LLC.

Dale Jefferson, Nathan Allan Wesely, Martin, Disiere, Jefferson & Wisdom, LLP, Houston, TX, Jon Jekel, Pillsbury Winthrop Shaw Pittman LLP, San Diego, CA, for Defendants/Third-Party Plaintiffs/Counter-Plaintiffs World Kuk Sool Association, Inc., WKSA, LLC.

Chris Pak, Katy, TX, Pro Se.

**MEMORANDUM AND RECOMMENDATION**

Peter Bray, United States Magistrate Judge

**\*1** This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). ECF No. 77. Several motions are pending before the court: Counter Defendant Sung Jin Su's (Su's) Motion to Dismiss, ECF No. 89; Su's Motion for Summary Judgment, ECF No. 105; Third-Party Defendant Chris Pak's (Pak's) Motion to Dismiss, ECF No. 90; Pak's Motion for Summary Judgment, ECF No. 104; Su's Motion to Strike, ECF No. 102; Defendants World Kuk Sool Association, Inc., WKSA, LLC, and Gaya Won LLC's Motion for Summary Judgment, ECF No. 109; Defendants' Motion to Strike Experts, ECF No. 110; and Su's Motion to Exclude Testimony, ECF No. 108.

The court recommends that: Su's Motion for Summary Judgment, ECF No. 105, be **GRANTED in part and DENIED in part;** Pak's Motion for Summary Judgment, ECF No. 104, be **GRANTED;** Su and Pak's Motions to Dismiss, ECF Nos. 89 and 90, be **DENIED as MOOT;** Su's Motion to Strike, ECF No. 102, be **DENIED as MOOT;** Defendants' Motion for Summary Judgment, ECF No. 109, be **GRANTED in part and DENIED in part;** and Defendants' Motion to Strike Experts, ECF No. 110, and Su's Motion to Exclude Testimony, ECF No. 108, be **DENIED** without prejudice to refiling as motions in limine before the trial judge.

Accordingly, the court recommends that all claims by all parties be dismissed, except for Su's claim based on violation of his right of publicity and Defendants' counterclaim against Su for trademark infringement.

*1. Background and Procedural Posture*

This suit involves a family business dispute between father and son in the Korean martial arts field. Sung Jin Su filed suit in California state court against three companies that are run by his family: World Kuk Sool Association, Inc., WKSA, LLC, and Gaya Won LLC (collectively WKSA). ECF No. 55. The suit was removed to federal court and transferred to the Southern District of Texas. *See* ECF No. 39. Thereafter, WKSA brought counterclaims against Su and third-party claims against Chris Pak, who is a former WKSA franchisee and who is proceeding pro se, and Alex Paul, who is Su's lawyer and a former WKSA member. ECF No. 87. Su and Pak filed motions to dismiss and for summary judgment as to all WKSA's claims against them, and WKSA filed a motion for summary judgment on Su's claims against it. Paul's motions are the subject of a separate Memorandum & Recommendation in which the court recommends dismissal for lack of personal jurisdiction over Paul. ECF No. 138. Paul's motions are therefore not discussed herein.

Su's Second Amended Complaint states that WKSA runs a "multi-million dollar company practicing and prom[oting] traditional Korean martial arts." ECF No. 55 ¶ 12. According to WKSA, World Kuk Sool Association, Inc. owns the intellectual property at issue in this case; WKSA, LLC is a franchisor that licenses franchisees to operate WKSA schools and use the WKSA name; and Gaya Won LLC sells KUK SOOL WON merchandise and services. WKSA's Third Am. Answer, ECF No. 87 at 2.

Case 4:26-cv-01462    Document 41    Filed 05/28/26 in TXSD    Page 34 of 50

**Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)**
2024 WL 5301787

In-Hyuk Suh, Su's father, established WKSA decades ago, and In-Hyuk Suh leads WKSA today. Su states in his Second Amended Complaint that he moved to California from South Korea in 1986 to work for WKSA and help build the WKSA business. ECF No. 55, ¶ 14.

**\*2** Su states that, for several decades, WKSA unconditionally agreed that Su would be the next President and Director of WKSA and that he would be WKSA's "next generation." Su's Second Am. Verified Compl., ECF No. 55 ¶ 15. According to Su, beginning in 1995 and continuing "throughout the years," WKSA publicized to the world that Su would be WKSA's next leader. *Id.* ¶ 16. Su also states that WKSA promised Su "an equitable share of all assets, including specific real estate [in Texas]." Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 3. In 2007, Su signed a document agreeing to perform specific duties on behalf of WKSA and to receive a set monthly salary in exchange for his services. ECF No. 109-1 at 146.

According to WKSA, Pak is a former WKSA franchisee who is now Su's assistant. *See* Roper Decl., ECF No. 118-1 at 2. Paul is an attorney who represents Su in this suit as well as a former WKSA black belt student. WKSA's Third Am. Answer, ECF No. 87 ¶ 61.

Su brings causes of action against WKSA for breach of contract, promissory estoppel, wrongful termination, unjust enrichment, intentional infliction of emotional distress, breach of his right of publicity, unfair competition, and defamation. ECF No. 55. Su's claims arise generally from his termination from employment with WKSA in March 2022. The cause for Su's termination is disputed between the parties but is not directly material to the court's instant recommendations. After his termination, Su started a competing Korean martial arts business called Mirae Kuk Sool or United Mirae Kuk Sool. Pak now works with Su and no longer has a WKSA franchise.

Su also states in his Second Amended Complaint that WKSA wrongfully continued to use Su's identity and image for commercial purposes after his termination. ECF No. 55 ¶¶ 89–96. Su states that WKSA, through Su's brother Alex Suh, made false and offensive statements about Su. ECF No. 55 ¶ 83. Portions of this dispute also arise from the publication of details of this lawsuit in various letters and on social media to the Korean martial arts community.

WKSA's claims against Su and Pak arise generally from Su and Pak's alleged unlawful use of WKSA's intellectual property and trade secrets, and their alleged breaches of contract. WKSA brings claims for trademark and copyright infringement, cybersquatting, misappropriation of trade secrets, civil conspiracy, breach of contract, and tortious interference with an existing contract.

WKSA has published several textbooks. These books are all titled *Kuk Sool Won Textbook* with a corresponding volume number. Roper Decl., ECF No. 118-1 p. 2, ¶ 8. WKSA states that it had *Kuk Sool Won Textbook Volume 5* in production while Su was still employed by WKSA. But Su wrote his own *Kuk Sool Won Textbook Volume 5*, allegedly with Pak, while still employed by WKSA. Then, shortly after Su's termination, he "began marketing a book titled *Kuk Sool Won Textbook Volume 5.*" *Id.* ¶ 7. It is unclear whether WKSA had published its Volume 5 textbook prior to Su's book's publication. In any event, WKSA alleges that the publication of Su's book violated WKSA's intellectual property rights, and that Su and Pak's competing business is a breach of contract. The court provides additional relevant facts in the analysis below.

The court turns next to the pending motions but will first make a few prefatory comments about the briefing and evidence presented to the court. The parties have presented the court with hundreds of pages of briefing and argument. Neither side has been willing to concede a single point, even when it is clear to the court that there is no evidence or law in support of their position. The parties have objected to evidence, objected to the other side's filings, and have generally engaged in a highly contentious legal dispute.

**\*3** That said, the court has read and carefully considered all the parties' filings. For reasons of judicial economy, however, the court has not addressed in writing every single argument that the parties have made. The court has addressed only those legal and factual issues that are relevant and material to the resolution of the pending motions. The parties should thus not assume that the court has failed to consider an argument that is not specifically discussed herein.

The court also notes that, while the parties have submitted voluminous briefing, that briefing does not cite much actual evidence. As will be discussed in Part 3, below, the court is not required to scour the record for evidence in favor of the parties' positions. The court has reviewed all the evidence the parties have cited but it appears that the parties have attached

much more evidence than what they have cited in their papers. The fact that the parties have attached something to their briefing does not obligate the court to review it. It is the parties' duty to provide citations to the evidence and explain how the evidence supports their arguments. Accordingly, the court reminds the parties that they should not complain later that the court did not consider evidence in the record that the parties did not bother to cite.

Finally, the court observes that, despite the length of the briefs, the parties have in many cases provided the court with little, if any, legal analysis. The parties often do not cite the elements of the causes of action they are attempting to pursue, do not state the factors that the court should consider in its analysis, and have left the court to do the research that the parties should have done themselves. Thus, while the court has endeavored to fully and fairly evaluate the parties' arguments, the parties should hesitate to fault the court for failing to consider cases, statutes, or legal theories that the parties did not bring to the court's attention.

### 2. Motions to Strike

Su and WKSA each filed motions to exclude the other party's experts. ECF Nos. 108, 110. The parties did not cite or otherwise rely on evidence from their experts in their motions for summary judgment, and therefore the court did not consider any expert testimony in its analysis. The court views the instant motions as motions in limine, which are best resolved by the trial judge. The motions to strike are therefore **DENIED** without prejudice to refiling as a motion in limine before the trial judge in the context of the Final Joint Pretrial Order.

### 3. Summary Judgment Legal Standard

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, "[t]he movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If this burden is met, the nonmovant must then "go beyond the pleadings," using competent summary judgment evidence to cite "specific facts" showing a genuine issue for trial. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

**\*4** The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The court, however, does not have a duty "to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) ("Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports [the] claim."). Although the court needs to consider only the cited evidence, it is allowed to consider other materials in the summary judgment record. Fed. R. Civ. P. 56(c)(3).

"[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence' " are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "[T]here must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### 4. Analysis

#### A. Su and Pak's Motions

Su and Pak filed motions to dismiss WKSA's claims for failure to state a claim under Rule 12(b)(6). ECF Nos. 89, 90. Those motions were filed approximately three months prior to Su and Pak's motions for summary judgment. ECF Nos. 104, 105. The court carried the motions to dismiss with the motions for summary judgment, and the motions for summary judgment re-urge the same arguments as in the motions to dismiss. The motions to dismiss should therefore be **DENIED as MOOT.**

In response to Su and Pak's motions to dismiss, WKSA filed a sur-reply without leave of court. ECF No. 100. Su filed

Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 5301787

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 36 of 50

a motion to strike the sur-reply. ECF No. 102. Because the underlying motions to dismiss should be denied, the court has not considered the sur-reply, so the motion to strike the sur-reply, ECF No. 102, is **DENIED as MOOT.** [1]

### i. Intellectual Property Claims: Counts I, II, III, V, and VI

WKSA brings claims of trademark infringement, contributory trademark infringement, copyright infringement, and misappropriation of trade secrets against Su and Pak. ECF No. 87. Su and Pak move for summary judgment on each claim against them and argue that there is no genuine issue of material fact because WKSA failed to identify evidence in the record supporting each of its claims. *See* ECF Nos. 105-1, 104-1.

In its response to Su and Pak's motions for summary judgment, WKSA addresses all the intellectual property claims against Su and Pak together and in less than two pages of briefing. ECF No. 118 at 4, 6. WKSA's responsive argument cites to the record only once—it cites to the "Roper dec.," without any pinpoint citations, and does not attempt in any meaningful way to explain how the cited evidence supports its claims. [2] *See* ECF No. 118 at 6. Hilda Roper is WKSA's "Compliance Officer." Her declaration is eight pages followed by approximately twenty pages of attached exhibits. ECF No. 118-1. WKSA does not claim that Roper is an expert. WKSA does not cite any experts in support of its intellectual property claims. The court has considered the full Roper Declaration in its analysis herein.

### a. Trademark Infringement and Contributory Trademark Infringement

**\*5** WKSA alleged trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) against both Su and Pak. ECF No. 87 at 19. "To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

Trademark registration with the U.S. Patent and Trademark Office (USPTO) is prima facie evidence of the validity of a registered mark. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009).

Showing a likelihood of confusion requires WKSA to prove that Su and Pak's use of WKSA's registered marks "is likely to cause confusion among consumers as to the source, affiliation, or sponsorship of [Defendant's] products or services." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483–84 (5th Cir. 2004), *abrogated in part on other grounds by Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016); *see also Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811–12 (5th Cir. 2019) [hereinafter *Springboards I*]). To prevail, the plaintiff ultimately must demonstrate a probability, not a mere possibility, of likelihood of confusion between the marks as to source, affiliation, or sponsorship. *Xtreme Lashes, LLC*, 576 F.3d at 226; *see also Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015).

The Fifth Circuit directs courts to consider the following nonexclusive list of factors known as the "digits of confusion" to decide whether the alleged use of a mark was confusing:

> (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers. [3]

*Springboards I*, 912 F.3d at 812 (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017)). "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.' " *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 697 (S.D. Tex. 2009) (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)). Rather, the court must assess each digit individually and then weigh them as a whole to determine whether there is a likelihood of confusion. *RE/MAX Int'l, Inc.*, 655 F. Supp. 2d at 697.

Case 4:26-cv-01462    Document 41    Filed 05/28/26 in TXSD    Page 37 of 50

Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 5301787

The digits are analyzed on a case-by-case basis according to the facts and circumstances presented. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020). "[L]ikelihood of confusion is typically a question of fact" although "summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.' " *Xtreme Lashes, LLC*, 576 F.3d at 227 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008)).

**\*6** WKSA provides evidence of its registered marks in Roper's Declaration. ECF No. 118-1 p. 3, ¶ 9. Roper declares that WKSA has registered, among others, a word mark for "KUK SOOL WON." *Id.* ¶ 9(a). She also declares that "KUK SOOL WON and KUK SOOL are trademarks of the World Kuk Sool Association, Inc." *Id.* ¶ 11. Thus, WKSA has presented evidence that it owns valid trademarks. Su does not dispute this, except in a single paragraph of his motion for summary judgment Su argues that "KUK SOOL WON" is a generic term and thus not entitled to trademark protection. ECF No. 105-1 at 15. Su supports this argument by incorporating by reference a Motion for Summary Judgment that he filed with the USPTO and attached as an exhibit to a declaration attached to his motion. He "requests that this Court review the motion submitted to the USPTO and rule that the mark, KUK SOOL WON, is generic." ECF No. 105-1. Su did not present the court with any responsive briefing that the court presumes was filed with the USPTO, and did not make any of the arguments before this court that he made before the USPTO.

Su's request is highly irregular. He asks this court to review and rule on an eighty-page document that was filed as a motion before an administrative agency. The attached briefing appears to be incomplete, and the issue has not been briefed *at all* before this court. Even if the issue were properly before this court, whether a mark is generic is not generally decided at the summary judgment stage. If a mark is generic, a court may cancel the mark's registration with the USPTO. *Xtreme Lashes, LLC*, 576 F.3d at 232. But because categorization of a mark as generic is a question of fact, summary judgment is rarely appropriate. *Id.* Moreover, the court sees cancellation of a registered mark as a highly consequential undertaking. Su is asking the court in effect to divest KSWA of what appears to be a central part of its intellectual property portfolio. The court would think that such a request would be properly presented to the court in a motion for summary judgment, not presented as an afterthought and incorporated by reference to

incomplete briefing before an administrative agency. Because the relief requested has extreme consequences, because it has not been properly presented to the court, and because the issue is a fact-intensive one, the court will not accept Su's invitation to declare the mark generic.

The question then becomes whether Su's and Pak's use of WKSA's marks is likely to cause confusion. Su argues that there is no evidence that his use of WKSA's mark is likely to cause confusion.

WKSA relies exclusively on Roper's declaration to raise a fact issue about the likelihood of confusion. While the evidence is not overwhelming, it is sufficient to create a fact issue on likelihood of confusion. Roper states in her declaration that Su markets the "*Kuk Sool Won Textbook Volume 5.*" Roper Dec., ECF No. 118-1 at 2 ¶ 8. Roper also avers that Su has created a competing organization called "the Mirae Kuk Sool/United Mirae Kuk Sool." *Id.* ¶ 5. She explains that WKSA's trademarks include the WKSA logo, which appears on all of WKSA's uniforms, and that Su's book features him wearing the WKSA uniform with "all the trademarked logos and words." *Id.* at 4 ¶ 10. According to Roper, since Su and Pak "have been infringing on the Association's trademarks, they have caused confusion over the KUK SOOL WON, as demonstrated by social media posts of potential students." *Id.* In support of that claim, Roper's declaration includes a screenshot of a Facebook post with a YouTube link. ECF No. 118-1 at 19. Below the YouTube link is a comment stating "So, stupid question is all of kuk sool won schools going under united mirae kuk sool?" *Id.* The comment was posted in response to a video titled "Mirae Kuk Sool Introduction" with the description "Introducing Master Sung Jin Suh." *Id.* Also according to Roper, WKSA's *Volume 5* textbook is not publicly available and only Master Instructors over the rank of 7th Degree Black Belt can purchase it. *Id.* p. 2–3, ¶ 8.

The evidence weighs in favor of WKSA on multiple digits of confusion: the type of trademark allegedly infringed is a wordmark for "KUK SOOL WON;" Su is using exactly that phrase in the title of his textbook, and part of that phrase in the name of his new organization. The products being offered are the same as WKSA's—Korean martial arts instruction. Arguably, Su's long history with WKSA could show Su's intent to infringe by publishing a book with the same title as WKSA's books after his termination.

**\*7** At least one digit of confusion could weigh in favor of Su. The fact that WKSA's *Volume 5* book is meant only

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 38 of 50

Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 5301787

for high-ranking WKSA black belt members could mean that the purchasers would exercise a high degree of care in purchasing products. Su's creation of the book prior to his termination does not change the analysis, and the lack of evidence showing actual confusion is not dispositive.

Su's burden on summary judgment with respect to the likelihood of confusion is to show that the record compels the conclusion that no genuine issue of material fact exists as to a probable likelihood of confusion. *See Xtreme Lashes, LLC*, 576 F.3d at 227 (quoting *Smack Apparel Co.*, 550 F.3d at 474). While WKSA could have done a much better job briefing the issue, Roper's declaration is sufficient to raise a genuine issue of material fact on whether Su's use of WKSA's marks is likely to cause consumer confusion. The record in this case does not compel the conclusion that there is no likelihood of confusion. Thus, a jury must decide. Su's motion for summary judgment should be denied on WKSA's trademark infringement claim against him.

Pak also moved for summary judgment on WKSA's trademark infringement claim. Although Pak does not specifically move for summary judgment on WKSA's contributory infringement claim, Pak is proceeding pro se and the court will liberally construe his motion. Because Pak seeks summary judgment on all claims against him, and because he has specifically argued that he is not liable for trademark infringement, the court interprets his motion as seeking summary judgment on both trademark infringement and contributory trademark infringement. *See* Pak's M. Summ. J., ECF No. 104-1 at 2.

A defendant can be secondarily liable for contributory infringement if there is underlying infringement by another. *Phoenix Ent. Partners LLC v. Boyte*, 247 F. Supp. 3d 791, 797 (S.D. Tex. 2017) (citing *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1240 (10th Cir. 2013)). Contributory infringement is "intentionally causing or knowingly facilitating the infringement of the plaintiff's mark by a third party." *Id.*

Pak argues that there is no evidence he has used any of WKSA's marks in commerce or that he created any likelihood of confusion. ECF No. 104-1 at 4. He declared that he has never infringed any WKSA trademarks. ECF No. 104-2 at 2. In its response to Pak's motion for summary judgment, WKSA does not even mention the concept of contributory infringement. In a part of their brief not relating to the intellectual property claims, ECF No. 118 at 3, WKSA cites

a portion of Pak's deposition wherein he admits to helping Su write the textbook, but he says he did that in early 2020, ECF No. 118-2 at 6–8, which the court understands to be during the time when Su still worked for WKSA. It is unclear to the court how Pak's contribution to the textbook at that time could constitute either trademark infringement or contributory trademark infringement. WKSA has not made any arguments to assist the court in understanding its position.

WKSA also cites the Roper Declaration, in which she states that *Su* markets the textbook and that Pak is Su's assistant. ECF No. 118-1 p. 2, ¶ 7. She does not say that *Pak* participates in marketing the textbook. WKSA does not explain how Pak acting as Su's assistant makes him liable for trademark infringement.

Although not discussed at all by WKSA, the court notes that Roper's declaration includes text messages showing that Pak wrote to a few people, apparently potential customers, discussing the new martial arts organization. ECF No. 118-1 at 9–14. Absent any argument about the meaning or import of these messages, the court is uncertain whether WKSA believes these messages are probative of Pak's liability. The court notes that the messages all make clear that Pak is discussing a *new* organization—one that is separate from and perhaps a better option than WKSA. The messages are being sent to what appear to be potential franchisees, thus arguably somewhat sophisticated consumers. Both of these things suggest that Pak's messages may not have been likely to confuse their recipients. Because WKSA has not explained how the facts support their legal theory, the court concludes that WKSA has failed to show that there is a genuine issue of material fact. The evidence does not show that Pak has used WKSA's marks in a manner that would be likely to cause confusion. Summary judgment should be granted against WKSA on its trademark claims against Pak.

### b. Copyright Infringement

**\*8** "[A] claim for copyright infringement has three elements: '(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity.' " *Batiste v. Lewis*, 976 F.3d 493, 502 (5th Cir. 2020) (quoting *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007)). To show factual copying, absent direct evidence of copying, a plaintiff can show "(1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." *Batiste*, 976 F.3d at 502. Not all factual copying

Case 4:26-cv-01462    Document 41    Filed 05/28/26 in TXSD    Page 39 of 50

is copyright infringement. *Id.* If the plaintiff shows factual copying, the plaintiff must then show that the infringing work is substantially similar to the protectable elements of the infringed work, which usually requires a side-by-side comparison of the protectable elements of the works. *Id.*

Ownership of a valid copyright is shown by compliance with statutory formalities, like registration, and proof of originality and copyrightability of the work as a whole. *Batiste,* 976 F.3d at 501. WKSA provides evidence that it has registered copyrights for "various textbooks, handbooks, and other materials." ECF No. 118-1 at p. 3, ¶ 9.

Su and Pak do not dispute the validity of WKSA's copyrights but argue that WKSA has not identified any specific copyrighted works that they infringed. ECF No. 104-1 at 5; ECF No. 105-1 at 16. In response, WKSA states that it has a copyright registration for *"Kuk Sool Won Textbook Volume 5"* and that WKSA "provided a list of copyrighted works registered with the U.S. Copyright Office that they were infringed, along with the registration numbers for each work." ECF No. 118 at 4.

Leaving the textbook to the side for the moment, WKSA's arguments are entirely conclusory and unsupported by the evidence. WKSA has not even attempted to describe its listed copyrighted works aside from listing their registration numbers and the titles of its textbooks. WKSA has not presented any evidence that Su or Pak infringed any of the listed works. There is no evidence in the record that Su or Pak made any unlawful use of any of WKSA's copyrighted works. There is no evidence, for example, that Su or Pak copied, distributed, or displayed any particular copyrighted work that WKSA owns. *See* 17 U.S.C. § 106 (listing an author's exclusive rights in a copyrighted work). The court has not been presented with evidence of the copyrighted works or evidence of Su and Paul's infringing works. There is no evidence from which the court could possibly determine that infringement has taken place.

The court turns to the textbook. WKSA argues that, by creating a book with the exact same *name* as their textbook, Su and Pak infringed on its copyright registration for the *"Kuk Sool Won Textbook Volume 5"* book. ECF No. 118 at 4, 6. It appears that WKSA is conflating trademark protection, which, as discussed above would apply to the book's title, with copyright protection, which would not. Titles of books are not entitled to copyright protection. *See* 37 C.F.R. § 202.1 (giving examples of works not subject to copyright

and excluding from protection "[w]ords and short phrases such as names, titles, and slogans"); *Macher v. Netflix, Inc.,* 684 F.Supp.3d 509, 515 (W.D. Va. 2023) (citing 37 C.F.R. § 202.1 and explaining that it is "well-settled" that titles are not copyrightable). WKSA alleges that Su is distributing a textbook of his own with the same title as theirs. It does not appear that WKSA is alleging that Su has actually copied WKSA's textbook. To the extent that WKSA does take the position that Su and Pak copied their textbook, they have not presented evidence of that. Again, the court does not have any part of WKSA's textbook or any part of Su's textbook. There is no way for the court to compare the two, and there are no experts or witnesses saying that they have compared the two and found any similarity. There is no evidence of copyright infringement.

**\*9** The court recommends that Su and Pak's motions be granted on the copyright infringement claim.

### c. Misappropriation of Trade Secrets

Because claims for trade secret misappropriation under the Defend Trade Secrets Act (DTSA) and Texas Uniform Trade Secrets Act (TUTSA) require proof of similar elements (other than the interstate commerce element required for the federal statute, which is not at issue here), courts generally analyze them together. *See, e.g., M-I L.L.C. v. Q'Max Sols., Inc.*, No. H-18-1099, 2019 WL 3565104, at \*3 (S.D. Tex. Aug. 6, 2019). The DTSA's statutory language is virtually identical to TUTSA's. The parties have not argued that DTSA and TUTSA require different elements of proof.

To prevail on a cause of action under either statute, WKSA must prove: (1) the existence of a trade secret; (2) that was acquired through the breach of a confidential relationship or through improper means; (3) which Su or Pak used without WKSA's permission. *GE Betz, Inc. v. Moffitt-Johnston,* 885 F.3d 318, 325 (5th Cir. 2018). The statutes phrase the cause of action to require only two elements: (1) the existence of a trade secret; and (2) misappropriation. 18 U.S.C. § 1836(b)(1); Tex. Civ. Prac. & Rem. Code § 134A.004(a).

"Trade secret" is defined by DTSA to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 40 of 50

**Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)**
2024 WL 5301787

information ... if ... the owner [of the trade secret] has taken reasonable measures to keep [the] information secret[ ] and ... the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

WKSA argues that Su had access to WKSA's email lists, which "are confidential trade secrets that have been used [by] the co-conspirators to solicit schools to leave KSW and have been used to disseminate unfounded allegations against KSW." ECF No. 118 at 4. Roper declares that "email addresses are not accessible by members or other school owners." ECF No. 118-1 at p. 5 ¶ 12. WKSA has not provided any evidence that it has taken reasonable measures to keep the email lists secret or that the information derives independent economic value from not being generally known. This is fatal to WKSA's claim. Because WKSA has not provided evidence of a trade secret under DTSA or TUTSA, its claims for misappropriation fail. The court also notes that Roper's declaration does not specify how Su obtained the email lists through improper means. The declaration also lacks any specifics on how Su or Pak improperly used the email lists. Roper states only that "Since Sung Jin Su was terminated these emails lists have been used by Sung Jin Su and Chris Pak's *co-conspirators* to harm KSW by sending extensive mass messaging to all KSW members and school owners ... containing unsubstantiated allegations." ECF No. 118-1 at 5-6 ¶ 12 (emphasis added). The court is left to wonder how the "co-conspirators" obtained the email lists, and whether Su or Pak had anything to do with the alleged improper use. WKSA appears to believe that the court can just assume that Su or Pak improperly provided the email lists to others, without any evidence of that.

**\*10** WKSA has not carried its summary judgment burden to present evidence supporting the elements of its claims. Su and Pak's motions should be granted on the trade secret misappropriation claims.

#### ii. *Cybersquatting: Count IV*

WKSA's cybersquatting claims are against only Paul. The court has recommended separately that WKSA's claims against Paul be dismissed without prejudice for lack of personal jurisdiction. ECF No. 138. The court therefore need not address the cybersquatting claims here.

#### iii. *Civil Conspiracy and Tortious Interference with Contract: Counts VII and IX*

In its response, WKSA addresses claims for civil conspiracy and tortious interference with an existing contract together. ECF No. 118 at 5. WKSA does not cite the elements of either cause of action or discuss how the court should apply the law to the facts of the case. WKSA's theory is that Paul, Pak, and Su are acting together to harm WKSA by: registering domain names using WKSA's trademarks, publishing the aforementioned textbook, filing actions in court to challenge their intellectual property rights, and publishing derogatory allegations in this lawsuit against KSWA. *Id.* at 3. The evidence WKSA provides in support of these claims is, again, the Roper Declaration (without any pinpoint citations), several excerpts from Su's, Pak's, and Paul's depositions, and a document that was attached to Pak's reply brief in support of his motion to dismiss, ECF No. 96 at 14. The document is a declaration alleging rape against an individual who is not a party to this suit.

The elements of civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Civil conspiracy is a derivative tort that "depends on some underlying tort or other illegal act. *Agar Corp. v. Electro Circs. Int'l, LLC*, 580 S.W.3d 136, 140–41 (Tex. 2019).

Given that WKSA has argued "Conspiracy and Tortious Interference" in a single heading together, ECF No. 118 at 2, the court understands WKSA to be arguing that its civil conspiracy claim is derivative of its tortious interference with contract claim. The court observes that WKSA's counterclaim and third-party complaint bases its civil conspiracy cause of action on misappropriation of trade secrets, breach of

fiduciary duties by Su and Pak, unjust enrichment, trademark and copyright infringement, and tortious interference with WKSA's contractual relationships with its franchisees and unidentified third parties. ECF No. 87 at 26–27. The court has recommended dismissal of most of the foregoing claims, except trademark infringement, which the court found should proceed to trial only as to Su, not Pak. There has been no showing that Pak had a meeting of the minds with Su with respect to damaging WKSA by infringing their trademarks, as discussed above. WKSA has not made any arguments about unjust enrichment or breach of fiduciary duty. Thus, all that is left to support a civil conspiracy claim is tortious interference with contract, which the court discusses next.

**\*11** The elements for tortious interference with an existing contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

WKSA argues that Su and Pak engaged in all manner of unlawful conduct meant to harm WKSA. ECF No. 118 at 5. WKSA states that Su made "a defamatory allegation of rape in the 1990's in the UK," *id.*, and that Pak attached that allegation to a pleading and dispersed the allegation to the WKSA community via email. WKSA assumes that the email list "can only have been garnered by using KSW's trade secrets." *Id.* It is unclear to the court how these allegations constitute conspiracy to tortiously interfere with an existing contract. WKSA fails to provide evidence showing any existing contract that Su or Pak willfully interfered with, which caused WKSA injury. WKSA does not say who it contracted with, when or on what terms. WKSA does not say how any of Su or Pak's conduct had an impact on any contract. Again, WKSA has failed entirely to articulate how its evidence supports its claims, and, thus, WKSA has failed to meet its burden as the nonmoving party to demonstrate the existence of a material fact issue. WKSA's claims for civil conspiracy and tortious interference fail as a matter of law, and Su and Pak's motions should be granted for these claims.

#### iv. Breach of Contract: Count VIII

WKSA brings a claim for breach of contract against Su and Pak. The elements for breach of contract are: (1) a valid contract, (2) performance by plaintiff, (3) breach of the contract by defendant, and (4) damages to the plaintiff

resulting from defendant's breach. *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018).

#### a. Su's Breach

WKSA argues that Su's creation of the *Kuk Sool Won Textbook Volume 5* "is a breach of the duty of loyalty, and thus a breach of contract." ECF No. 118 at 7. WKSA does not present evidence of any contract requiring a duty of loyalty. Thus, there can be no breach of contract based on any lack of loyalty. WKSA is conflating the breach of the duty of loyalty with breach of contract. The duty of loyalty is a fiduciary duty, and employees are generally not fiduciaries of their employers simply by virtue of the employment relationship. *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018). Employees can sometimes owe their employers certain limited fiduciary duties, *see id.*, but a claim for breach of fiduciary duty is different from a claim of breach of contract, which is the cause of action WKSA alleged against Su. ECF No. 87 at 27–29.

In any event, WKSA states that Su was employed by WKSA, and during that time, Su drafted "Volume 5" of a WKSA textbook. ECF No. 118 at 7. Su then lied about creating the book and told In-Hyuk Suh that he was not working on the book. *Id.* Su also told others that he would be fired when WKSA learned that he made it. ECF No. 118 at 7. Even if true, these facts fail to create a material fact dispute for breach of contract. WKSA does not provide any specific contractual provision that Su breached by creating the textbook. Accordingly, because WKSA has failed to show the existence of a contract or its breach, its claim for breach of contract against Su fails.

#### b. Pak's Breach

**\*12** WKSA states in its response that its claim for breach of contract against Pak "is even more explicit" than that against Su. ECF No. 118 at 7. WKSA states that Pak "entered into a personal guarantee as a school owner that he would not compete with KSW." *Id.* WKSA states that Pak is competing with it, and thus, has breached his agreement. *Id.* The only evidence that WKSA offers to support its claim against Pak is, yet again, the Roper Declaration.

Pak, proceeding pro se, argues that WKSA has failed to provide the contractual language at issue, and that WKSA has

provided no evidence of damages. ECF No. 104-1 at 7–8. In his reply, Pak argues that any restrictive covenants that the franchise agreement might contain are unenforceable. ECF No. 122 at 11–12.

WKSA's presentation of its argument supporting its claim for breach of contract against Pak is incomplete. WKSA did not supply the court with the contracts it entered into with Pak. Nor does WKSA supply the court with the contractual language that governs the parties' relationship. All the court has for WKSA's claim against Pak is the Roper Declaration. The Roper Declaration states that Pak entered a franchise agreement with WKSA and "executed a Confidentiality and Non-Competition Agreement ... which prohibited Pak from using any confidential information belonging to WKSA except as permitted under the Franchise Agreement, and which prohibited Pak from competing with WKSA in the martial arts industry in the event the Franchise Agreement was terminated." ECF No. 118-1 at p. 7 ¶ 15. This broad assertion fails to provide the terms of the agreement or to show that it is enforceable.

In Texas, a covenant not to compete is enforceable if (1) there is an otherwise enforceable agreement, (2) the covenant not to compete is ancillary to or part of that agreement, and (3) it is enforceable to the extent that it "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary." Tex. Bus. & Com. Code Ann. § 15.50; *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464–65 (5th Cir. 2003). WKSA has provided no evidence of the specific terms of the agreement or any evidence supporting the requirements for a valid covenant not to compete. WKSA has thus failed to show that it has a claim for breach of the agreement not to compete.

Even if WKSA's evidence supported the existence of a valid non-compete agreement that Pak breached, WKSA has not provided the court with any evidence that it suffered damages resulting from Pak's alleged breach. *See* ECF No. 118 at 7. The Roper Declaration makes the conclusory statement that "Pak recruited other franchisees of [WKSA] to Su's competing martial arts organization, relying on information they learned from [WKSA]." ECF No. 118-1 at p. 7 ¶ 16. The evidence shows that Pak sent messages via a messenger app, which do not appear to use WKSA's allegedly confidential emails, soliciting business for Su's new organization. *See* ECF No. 118-1 at 13. The exhibits do not show who the messages are to, and WKSA fails to show that that anyone that Pak

contacted left WKSA or that it was otherwise injured by Pak's alleged breach.

Thus, WKSA has failed to meet its burden to articulate how its evidence supports its claims for breach of contract. WKSA's breach of contract claim fails, and Su and Pak's motions should be granted on this claim.

### B. WKSA's Motion for Summary Judgment on Su's Claims

**\*13** Su brought eight claims against WKSA: breach of contract, promissory estoppel, wrongful termination, unjust enrichment, defamation, breach of the right of publicity, unfair competition, and intentional infliction of emotional distress. ECF No. 55. WKSA seeks summary judgment on all Su's claims against it. ECF No. 109 at 1.

In his response, Su relies heavily on statements in his Second Amended Verified Complaint as evidence to support his claims. *See, e.g.*, ECF No. 117 at 3. "A plaintiffs verified complaint can be considered as summary judgment evidence to the extent that it comports with the requirements of Fed. R. Civ. P. 56(e)." *King v. Dogan*, 31 F.3d 344 (5th Cir. 1994) (citing *Barker v. Norman*, 651 F.2d 1107, 1114–15 (5th Cir. 1981)). Su signed the Second Amended Verified Complaint and declared under penalty of perjury that its contents are true and correct to the best of his knowledge and belief. ECF No. 55 at 27. WKSA did not file a reply and there are no objections to Su's evidence. The court considers Su's Second Amended Verified Complaint in the following analysis.

### i. Breach of Contract

Su alleges that WKSA formed an oral contract with Su that gave him "an unconditional lifetime appointment to be the 'next generation' ... of [WKSA's] businesses" and "an equitable share of all assets including real estate." ECF No. 55 ¶¶ 56–57. Su alleges that he performed his duties under the agreement, but WKSA breached when it terminated Su's employment. *Id.* ¶ 58–59.

In its summary judgment motion, WKSA denies the existence of a valid lifetime appointment contract. ECF No. 109 at 6. WKSA argues that Su signed a written agreement setting his salary, which did not modify his at-will employment status. WKSA also argues that even if there were an oral agreement

for lifetime appointment, it would not be enforceable because it is not in writing as required by the Texas Statute of Frauds. *Id.* at 7. Su responds by arguing that the Statute of Frauds does not apply, and even if the Statute of Frauds does apply, he meets the partial performance exception, and his agreement should thus be enforced. ECF No. 117 at 4.

The elements for breach of contract are: (1) a valid contract, (2) performance by plaintiff, (3) breach of the contract by defendant, and (4) damages to the plaintiff resulting from defendant's breach. *Williams*, 884 F.3d at 244.

Under the Statute of Frauds, an agreement that "is not to be performed within one year" of the date on which it was made is not enforceable unless it is in writing and signed by the person committed to perform or by someone authorized to sign for that person. Tex. Bus. & Com. Code Ann. § 26.01. The party pleading the Statute of Frauds bears the initial burden of establishing its applicability. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 641–42 (Tex. 2013). If the pleading party meets its burden, the burden shifts to the opposing party to establish an exception that would take the verbal contract out of the Statute of Frauds. *Id.*

To establish that the Statute of Frauds applies, WKSA argues that Texas courts consistently apply the Statute of Frauds to employment agreements that are intended to last until the employee retires, ECF No. 9 at 8–9 (citing cases). Under Texas law, oral promises of permanent or lifetime employment are barred by the Statute of Frauds. *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 472–73 (5th Cir. 1991); *Massey v. Houston Baptist Univ.*, 902 S.W.2d 81, 84 (Tex. App.—Houston [1st Dist.] 1995, writ denied). WKSA met its initial burden to show that the Statute of Frauds applies to agreements for lifetime employment.

 **\*14** Su argues in response that the "partial performance" exception to the Statute of Frauds applies because he substantially performed. ECF No. 117 at 4. "Under the partial performance exception to the Statute of Frauds, contracts that have been partly performed, but do not meet the requirements of the Statute of Frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Yee v. Anji Techs., LLC*, No. 05-18-00662-CV, 2019 WL 2120290, at \*7 (Tex. App.—Dallas May 15, 2019, no pet.) (quoting *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 192 (Tex. App.—Dallas 2013, pet. denied)). The partial performance that a party relies on to meet the exception must be unequivocally referable to

the oral agreement "such as could have been done with no other design than to fulfill the particular agreement sought to be enforced." *Id.* (quoting *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439–40 (Tex. App.—Dallas 2002, pet. denied)). Otherwise, "[i]f the evidence establishes that the party [who partially performed] could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426–27 (Tex. 2015) (per curiam).

WKSA's motion states that Su "signed a document that set his salary." ECF No. 109 at 6. To support this argument, WKSA cites to "Su Exh. 1, 2." *Id.* These documents are written in Korean, and an English translation is provided. [4] ECF No. 109-1 at 140, 146. Exhibit 2 (ECF No. 109-1 at 145–48) is an agreement, signed by Su on January 24, 2007, wherein Su agrees to receive a monthly salary of $2,500. *Id.* at 146. Su also agrees to five specific terms in the agreement; (1) managing and reporting results of San Francisco regional belt tests, (2) attending WKSA competitions, (3) attending seminars, (4) attending foreign business trips, and (5) promoting "harmony among the brothers and remain[ing] dedicated to the affairs of [WKSA]." ECF No. 109-1 at 146.

This agreement appears to be an employment agreement. It does not provide for Su to eventually inherit WKSA or its assets; nor does it provide for a "lifetime appointment." Because Su entered into an agreement to work for WKSA in exchange for pay, his performance of that work cannot be characterized as "unequivocally referrable" to the alleged oral agreement or having been done "with no other design" than to fulfil the alleged oral agreement. *Yee, LLC*, 2019 WL 2120290, at \*7. As such, the partial performance exception is unavailable, and the Statute of Frauds applies. *Nat'l Prop. Holdings*, 453 S.W.3d at 426–27; *see also Sullivan v Leor Energy, LLC*, 600 F.3d 542, 548 (5th Cir. 2010) (holding that payment of salary in exchange for services is insufficient to show partial performance because the services are fully explained by the salary without supposing any additional consideration).

The court also notes that the partial performance exception to the Statute of Frauds applies only if denial of performance would amount to a "virtual fraud." *Sullivan*, 600 F.3d at 459. That requires the proponent of the exception to show 1) strong evidence establishing the existence of an agreement and its terms; 2) that the party acting in reliance on the agreement

suffered a substantial detriment for which he has no adequate remedy; and 3) that the other party would reap an unearned benefit. *Id.* Su does not come close to showing any of these things. Su does not describe the specific terms and conditions of the promises that were allegedly made to him. At best, it appears that the parties had high hopes for Su and that he would one day be the head of the company. There is no evidence about what the specific terms and conditions of the alleged promises were. Moreover, it appears that Su was paid for his services, and Su has presented no evidence of any benefit WKSA has obtained for which it has not paid. Su has not carried his burden to show that the partial performance exception to the Statute of Frauds applies.

**\*15** It is unclear to the court whether WKSA argues that the Statute of Frauds also bars Su's claim for breach of the agreement to provide him with an equitable share of all assets, including property. Neither party has clearly briefed the issue. In any event, this claim fails on the merits.

Su's allegation is that WKSA "promised an equitable share of all assets, including specific real estate." Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 3. Taking Su's broad statement as true, and even if the Statute of Frauds does not bar this theory of recovery, Su has not described the specific details of the contract to allow the court to understand how WKSA breached it. For example, Su fails to allege an enforceable contract with an offer, acceptance, and consideration; he does not state when WKSA was required to convey the property interest or what share he agreed to receive; he leaves out how WKSA's termination of his employment is a breach of the alleged agreement to convey property to him. Su has not provided any evidence about the extent of his "equitable interest" under the agreement or his damages for the alleged breach. In fact, because the time for conveyance of the property interest is not specified, it is not even clear that there has yet been a breach.

Because the Statute of Frauds applies and there is no applicable exception to Su's employment-based claims, and because Su has failed to show evidence supporting his claim for WKSA's failure to convey property interests to him, WKSA's motion for summary judgment should be granted for Su's breach of contract claim.

### ii. Promissory Estoppel

If a promisee detrimentally relies on an otherwise unenforceable promise, and if injustice can be avoided only by enforcement of the promise, the promisee may have a claim for relief under promissory estoppel. *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 977 (5th Cir. 2014). To state a claim for promissory estoppel in Texas, a plaintiff must show: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *Id.* (quoting *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)). "[W]hen promissory estoppel is used to enforce a promise that would be unenforceable because of the statute of frauds, the promise must be a promise to sign an already existing written agreement that would itself satisfy the requirements of the statute of frauds." *Ellen v. F.H. Partners, LLC*, No. 03-09-00310-CV, 2010 WL 4909973, at \*4 (Tex. App.— Austin Dec. 1, 2010, no pet.) (citing *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982)).

Here, Su argues that WKSA promised Su a lifetime appointment, that he would be the next generation of WKSA, and an equitable share in all WKSA's assets, including real estate. Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 6. Where the Statute of Frauds bars enforcement of a contract, it also bars claims for promissory estoppel unless the promise seeking to be enforced is a promise to sign a written agreement. *See Ellen*, 2010 WL 4909973, at \*4. There is no evidence that such an unsigned written agreement exists. Accordingly, Su cannot recover based on alleged promises of lifetime appointment and that he would be the "next generation" of WKSA because those claims are barred by the Statute of Frauds. Moreover, because it appears that Su agreed to perform services in exchange for pay, Su has failed to present evidence that he relied on any promise to his detriment.

**\*16** As to the promise to convey real property, there are two problems. First, the court does not have any evidence of the details of any promises made. The court has only a single sentence in Su's Second Amended Verified Complaint that In-Hyuk Suh "promised Plaintiff an ownership interest in all assets of Defendants, including [certain real property in Texas.]" ECF No. 55 ¶ 18. As discussed above, the court does not know, for example, when the interest was to be transferred, what the nature of the interest was to be, or how it was to be conveyed.

Second, Su does not provide any evidence that he reasonably and foreseeably relied on the promise to convey a property

interest to him. Su states that he practiced Korean-style martial arts and declined other opportunities based on the "unconditional promise" of leading WKSA someday. ECF No. 55 ¶ 19. Su does not present any evidence to show that his continued practice of martial arts was in any way connected to or in reliance on the promise that he would inherit real property. Again, the universe of evidence cited before the court is Su's isolated statements in his Second Amended Verified Complaint. This is insufficient to create a fact issue regarding his property-related promise.

Because Su has failed to provide evidence supporting his promissory estoppel claim, WKSA's motion on this claim should be granted.

### iii. Wrongful Termination

Su alleges wrongful termination based on two theories of recovery.

First, Su alleges wrongful termination under the Texas Commission on Human Rights Act (TCHRA) based on "retaliation for complaining about [WKSA's] suspected illegal or unethical activity in violation of ... Texas Labor Code § 21.051." ECF No. 55 ¶¶ 70–74. An employer commits an unlawful employment practice under this statute if it discharges an employee based on the employee's race, color, disability, religion, sex, national origin, or age. Tex. Lab. Code § 21.051. An aggrieved person with a claim under the TCHRA must file a complaint with the Texas Workforce Commission (TWC) within 180 days of the date of the alleged unlawful conduct. Tex. Lab. Code §§ 21.202(a), 21.201.

WKSA argues that Su's claim for wrongful termination under the TCHRA fails because Su does not allege membership in a protected class under the statute and because Su does not meet the statute's pre-suit administrative exhaustion requirements. WKSA's M. Summ. J., ECF No. 109 at 10. Su has not alleged or provided evidence that he was terminated because of his membership in any protected class under the TCHRA. To the extent that Su has a recognizable claim for retaliation under the TCHRA, Su has not provided any evidence that he exhausted his administrative remedies by filing a complaint with the TWC. Thus, his claim under the TCHRA fails.

Second, Su bases his claim for wrongful termination on WKSA's alleged retaliation for Su reporting WKSA's illegal or unethical activity. ECF No. 55 ¶ 72. WKSA argues that

Texas does not provide general protection for private-sector whistleblowers, and Su's characterization of retaliation based on whistleblowing accordingly fails. ECF No. 109 at 10–11.

The Texas Supreme Court has considered and explicitly declined to recognize a cause of action for private employees who are discharged for reporting illegal activities. *Winters v. Houston Chronicle Pub. Co.*, 795 S.W.2d 723, 724–25 (Tex. 1990) (declining to expand the exception it recognized in *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985) (allowing a cause of action for wrongful termination where an employee declined to perform an illegal act)). Thus, to the extent that Su claims wrongful termination based on retaliation for reporting illegal activities, that claim fails as a matter of law.

**\*17** Third, Su argues in his response that, even though Texas "adheres to the at-will employment doctrine, the facts of this case strongly support an exception based on fraudulent inducement." ECF No. 117 at 7. Su argues that his sudden termination after decades of promises for future employment "strongly suggests that the Defendants never intended to fulfill their promises." ECF No. 117 at 8. The evidence does not support this argument. Fraudulent inducement requires evidence that the promises, if any, were false when made. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012). There is no evidence of that. Su worked for WKSA for decades. All the evidence points to a sudden falling out. In any event, Su fails to show how fraudulent inducement allows him to make a claim for wrongful termination and Su fails to show how his evidence supports a claim for wrongful termination on its face. WKSA's motion should be granted on Su's wrongful termination claim.

### iv. Unjust Enrichment

Su alleges that WKSA was unjustly enriched because WKSA incorrectly classified him as an independent contractor, and thus, did not give Su benefits like health insurance, retirement contributions, or paid leave. ECF No. 55 ¶¶ 77–81. Su also alleges that he paid increased taxes because of his misclassification. *Id.*

Unjust enrichment occurs when someone secures a benefit wrongfully or passively receives a benefit that would be unconscionable to retain. *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.). To successfully assert a claim for unjust enrichment,

Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 46 of 50

Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)
2024 WL 5301787

a party must allege that "one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

The Texas Supreme Court has explained that unjust enrichment claims are based on quasi-contract, or a legal obligation "to do justice even though it is clear that no promise was ever made or intended." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex. 2000). Generally, because unjust enrichment claims are based on a quasi-contract theory, when a valid, express contract covers the subject matter of the dispute, a party cannot recover for unjust enrichment. *Id.* at 684. That is because recovery under an equitable theory, like unjust enrichment, is generally inconsistent with the express agreement. *Id.*

As discussed above, WKSA provided evidence of an agreement between WKSA and Su that set the terms of Su's payment and his performance obligations in return. *See* ECF No. 109-1 at 146. Su does not argue that this agreement is invalid. Su argues that his unjust enrichment claim "is not necessarily precluded" and the fact that he was an at-will employee does not foreclose the possibility that WKSA was unjustly enriched by Su's performance. Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 9–10. Even viewing the evidence in the light most favorable to Su, he had an express agreement with WKSA about his payment and performance expectations. Because the terms of Su's payment and employment were set in an express contract, Su cannot recover under unjust enrichment. Su has also not shown WKSA received a benefit through fraud, duress, or by taking undue advantage. Thus, WKSA's motion should be granted for this claim.

### v. Intentional Infliction of Emotional Distress (IIED)

Su brings a claim for IIED and alleges that WKSA engaged in extreme and outrageous conduct by publicly terminating and ridiculing him. ECF No. 55 ¶¶ 111–19.

To state a claim for IIED under Texas law, a plaintiff "must demonstrate that the defendant intentionally or recklessly engaged in extreme or outrageous conduct that resulted in severe emotional distress." *Stelly v. Duriso*, 982 F.3d 403, 407–08 (5th Cir. 2020) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 66 (Tex. 1998)). The plaintiff must also demonstrate that there is no alternative cause of action available to redress the alleged misconduct. *Id.* at 408 (citing *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004)). That is because "IIED is a 'gap-filler' tort reserved for 'those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress.' " *Id.* (quoting *Hoffman-La Roche*, 144 S.W.3d at 447).

**\*18** WKSA argues that Su's claim fails as a matter of law because termination of an at-will employee and ordinary employment disputes do not rise to the level of conduct required to state a claim for IIED. ECF No. 109 at 11–12.

To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 606 (Tex. 1999) (citing *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994)). Texas has a strict approach to IIED claims that arise in the workplace—ordinary employment disputes do not meet this high standard. *Id.* at 612–13. A plaintiff in an employment dispute must show conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct, which exists only in the most unusual circumstances. *Id.* at 613.

Su argues that WKSA "engaged in a pattern of abusive conduct, including publicly humiliating the plaintiff and ultimately terminating him without cause after decades of service," Su's Resp. to WKSA's M. Summ. J., ECF No 117 at 12. According to Su, "the special relationship between the Grandmaster, In Hyuk Suh, and his first-born son, Plaintiff, creates a context in which the alleged conduct could be considered particularly egregious." ECF No. 117 at 12–13. Su is not clear about what specific conduct is the basis for his IIED claim. For example, he alleges a pattern of abuse but does not explain how WKSA allegedly abused him. The evidence Su provides does not show abuse or any unusual facts about his termination that would bring it outside the scope of a typical employment dispute.

Su does not say, but rather implies, that the letter from WKSA to its masters and schools, ECF No. 55-3 at 4–5, constitutes egregious conduct. While the letter may be unpleasant for Su, Su has failed to demonstrate that it was outrageous or extreme. *See* ECF No. 55-3 at 4–5 (informing WKSA's members of "the ongoing civil dispute," stating that Su is "spreading lies,"

and urging its members to "be the calm, rational, and non-emotional party"). Su has not provided the court with any evidence of extreme or outrageous conduct that meets the threshold to state a claim for IIED in Texas. Accordingly, WKSA's motion should be granted for the IIED claim.

### vi. Right of Publicity

The "right of publicity" refers to the tort of misappropriation of one's name or likeness. *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587, 590 (N.D. Tex. 1999). This cause of action is based on the idea that anyone who, for their own benefit, uses the name or likeness of another is subject to liability for the invasion of the other's privacy. *Id.* To state a claim for this type of misappropriation, the plaintiff must show "(i) that the defendant appropriated the plaintiffs name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (ii) that the plaintiff can be identified from the publication; and (iii) that there was some advantage or benefit to the defendant." *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994).

 **\*19**  In his Second Amended Verified Complaint, Su states that WKSA wrongfully continued to use Su's identity and image for commercial purposes after his termination. ECF No. 55 ¶¶ 89–96. Su states that the value associated with using his name and likeness was cultivated over years, and the respect he earned as "a highly skilled martial artist helped greatly enrich" WKSA's business. *Id.* ¶ 20.

WKSA does not argue that Su lacks evidence on any element of his claim. Rather, WKSA argues that Su's claim fails because Su does not have a right to privacy for photos taken during his employment. WKSA's M. Summ. J., ECF No. 109 at 12–13. WKSA cites *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 726 (S.D. Tex. 2016) for the proposition that "[a]n employer has the right to use employee images for business purposes." ECF No. 109 at 13. But that case says no such thing. *See Carter*, 175 F. Supp. 3d at 726 ("[This case is] grounded in 42 U.S.C. § 1983 and the Fourth Amendment ... [it alleges] excessive force and unreasonable search and seizure, in addition to assault and battery and false imprisonment"). The case is about excessive use of force and unreasonable search and seizure. *Id.* There is no mention of the right of publicity.

The court's own research has not found any support for WKSA's legal position. In a recent case about an employer's

alleged misappropriation of its employee's name after she was no longer an employee, the court did not address whether an employer has a right to use its employee's name or likeness. *See Guijarro v. Charles P. Johnson, Inc.*, No. 13-19-00268-CV, 2021 WL 1133614, at *3–4 (Tex. App.—Corpus Christi–Edinburg Mar. 25, 2021, pet. denied). Instead, the court discussed the employee's prior *consent* to use her name. *Id.*

WKSA also argues that there is no ongoing use of Su's likeness because it removed Su's image from its materials. WKSA's M. Summ. J., ECF No. 109 at 13. WKSA provides deposition testimony from Hilda Roper that WKSA no longer uses Su's photo or likeness in any textbooks, pamphlets, and other material. ECF No. 109-4 331:20–332:9. But there is a material fact dispute about whether WKSA removed all references to Su. Su states that WKSA "continued to use [Su's] name, image, and likeness in [its] promotional materials, websites, and social media accounts even after his termination." ECF No. 117 at 14. Su provides evidence of this continued use in WKSA's "Franchise Disclosure Agreement." ECF No 117-1 at 25. The document, dated March 1, 2024, states that WKSA's "training seminars are overseen by Grandmaster In Hyuk Suh, Master **Sung Jin Suh**, Master Alex Suh and Master Barry Harmon.... Master **Sung Jin Suh** is a Certified 9th Degree Black Belt and has been teaching seminars since 1991. He has been our Vice President since August 2007." *Id.* at 4, 25 (emphasis added). Thus, apart from images obtained when he was an employee, WKSA appears to be using Su's name and notoriety to profit.

Because there is a material fact issue about the continued use of Su's name or likeness, and because Su has provided evidence to support the elements of his claim, WKSA's motion should be denied on Su's right of publicity claim.

### vii. Unfair Competition

A Texas common law claim for unfair competition is an umbrella claim "for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). To make a claim for unfair competition, the plaintiff must show an independent tort or otherwise illegal act by the defendant that interfered with the plaintiff's ability to conduct its business. *Id.*

*Case 4:26-cv-01462   Document 41   Filed 05/28/26 in TXSD   Page 48 of 50*

**\*20** WKSA argues that Su has not alleged any independent illegal act that would support an unfair competition claim. WKSA's M. Summ. J., ECF No. 109 at 13–14. WKSA also argues that Su has not demonstrated how any alleged acts by WKSA interfered with Su's ability to do business.

Su argues that he has established underlying tortious activity by WKSA and that he has been harmed by WKSA's conduct. Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 18. Su fails to provide any evidence supporting his claim that WKSA's actions interfered with his ability to conduct business. The only evidence Su provides in his response is one paragraph in his Second Amended Verified Complaint, which states that WKSA has publicly stated that it has millions of active members. [5] *Id.*; ECF No. 55 ¶ 101 (citing Exhibit D, ECF No. 55-2 at 1–8). Su has not met his burden to identify specific evidence in the record that creates a fact issue about whether WKSA's actions interfered with Su's ability to do business. Accordingly, WKSA's motion should be granted on Su's unfair competition claim.

### *viii. Defamation*

"[T]he threshold requirement for [defamation] is the publication of a false statement of fact to a third party." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). Defamation may occur through slander, which is the spoken expression of a defamatory statement, or libel, which is a written or other graphic form of defamatory statement. *Id.* at 623–24. To state a claim for defamation, a plaintiff must show "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases." *Klocke v. Watson*, No. 22-10348, 2023 WL 2823060, at \*5 (5th Cir. Apr. 7, 2023). A statement is defamatory if it harms the reputation of another "as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020). If a statement is not verifiable as false, it is not defamatory. *Dallas Morning News*, 554 S.W.3d at 624.

A statement is defamation per se if it injures a person in his office, profession, or occupation. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013). "Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character

that it is peculiarly valuable in the plaintiff's business or profession." *Id.* at 67.

Su states in his Second Amended Verified Complaint that WKSA, through Alex Suh, "stated falsely in front of a large audience of masters and school owners that [Su's] 'way of doing martial arts was wrong,' that [Su] did not make himself available for WKSA-hosted events, that he was 'disrespectful,' a 'betrayer' and 'did not bow' to In Hyuk Suh[.]" ECF No. 55 ¶ 83. Su also states that WKSA published these statements to the broader Korean martial arts community, which harmed Su's reputation. *Id.* ¶ 84. Additionally, Su states that an individual, Mr. Gause, tells those in the Korean martial arts community and posts online allegedly defamatory statements about Su including that Su is a "damn liar and con," "lowlife," "pissy little bitch," and "rip-off artist," among others. *Id.* ¶ 85.

**\*21** WKSA seeks summary judgment in reliance on the Texas Defamation Mitigation Act, which provides that "[a] person may maintain an action for defamation only if: (1) the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant; or (2) the defendant has made a correction, clarification, or retraction." Tex. Civ. Prac. & Rem. Code Ann. § 73.055(a). WKSA argues that, because Su has not met this threshold request requirement, his defamation claim fails as a matter of law. ECF No. 109 at 14–15. This argument fails.

A plurality of the Texas Supreme Court recently held that "[t]he plain language of the statute does not support a right to dismissal for failing to provide a sufficient request before the statute of limitations expires." *Hogan v. Zoanni*, 627 S.W.3d 163, 176–77 (Tex. 2021). The appropriate remedy for failure to timely provide a sufficient request is not dismissal, but loss of exemplary damages. *Id.* at 165 ("the DMA prescribes the abatement of claims and loss of exemplary damages, rather than dismissal"); *see also Berrios v. Cox*, No. EP-23-CV-63-KC, 2024 WL 89453, at \*5 (W.D. Tex. Jan. 8, 2024), *reconsideration denied*, No. EP-23-CV-63-KC, 2024 WL 3223687 (W.D. Tex. Feb. 6, 2024) ("the *Hogan* plurality reiterated what most state and federal courts to consider the issue had already concluded: Failure to comply with the DMA's request requirement does not require dismissal.").

Because the failure to request a retraction is not sufficient cause to dismiss Su's claim, the court considers WKSA's next argument: that Su's defamation claims are based on postings that are not attributable to WKSA. In response, Su provides

Case 4:26-cv-01462    Document 41    Filed 05/28/26 in TXSD    Page 49 of 50

**Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)**
2024 WL 5301787

three exhibits on which he bases his defamation claim. Two of these exhibits, Exhibits K and L, appear to be letters on WKSA letterhead from WKSA to WKSA masters and school owners. ECF No. 55-3 at 1–5. The third, Exhibit M, appears to be a letter from Alex Suh to WKSA school owners. ECF No. 55-3 at 6–7. It is unclear to the court how letters that are apparently published by WKSA are not attributable to WKSA. In the absence of any clarifying arguments by WKSA, the court proceeds as if any allegedly defamatory statements in the letters from WKSA can be attributed to WKSA.

WKSA argues that "the communications are not defamatory on their face." WKSA's M. Summ. J., ECF No. 109 at 14. In response, Su states that WKSA's statements are defamatory per se because they injure him in his profession or occupation. Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 19. Su provides evidence that WKSA stated that Su "has not made himself available for the various events hosted by the WKSA" and that Su has chosen to "disregard and ignore [ ] orders and directives, and continues to work against the best interests of the WKSA." ECF No. 55-3 at 2. Su argues that this suggests a dereliction of duty. ECF No. 117 at 19. Su also argues that "Exhibits L and M contain statements insinuating that Plaintiff acted against the interests of the organization." *Id.* Su does not provide any specific statements in Exhibit M that he alleges to be defamatory.

Su has not shown that any statements in these exhibits are defamatory or provably false, made with any degree of fault or negligence, or that the general disparagements of character are particularly valuable in his field. *See Hancock, 400 S.W.3d at 67* ("the proper inquiry is whether a defamatory statement accuses a professional of lacking a peculiar or unique skill that is necessary for the proper conduct of the profession"). It is Su's burden to show how the statements are false and defamatory. The court cannot perform that analysis by reference only to the statements themselves. As such, Su has not carried his burden to show defamation per se based on the letters in Exhibits K, L, or M.

 **\*22**  In addition to the letters, Su provides evidence of social media posts that "directly attack Plaintiff's character and professional reputation, including accusations of unethical behavior and incompetence," which, when viewed in context, "clearly injure Plaintiff in his profession and impute dishonesty or questionable business practices to him." Su's Resp. to WKSA's M. Summ. J., ECF No. 117 at 19. Su has not met his burden to show that the social media posts are

defamatory. Su provides several pages of screenshots from social media, but the statements contained within the posts generally state that "people" are making up false ways of practicing Kuk Sool, ECF No. 55-3 at 12–14, and that "every organization and association has unethical people that are often purged," *id.* at 14. The posts may allude to Su, without naming him, but they do not appear to state provably false statements, nor do they appear to be fact. *See Dallas Morning News,* 554 S.W.3d at 639 ("even when a statement is verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as fact."). Because Su has not explained how these statements are defamatory or provably false, his claim for defamation based on these posts fails.

Su has not met his burden to provide evidence showing a fact issue on his claim for defamation. Thus, WKSA's motion on Su's defamation claim should be granted.

### *C. Su's Motion for Summary Judgment on WKSA's Defenses*

WKSA alleged sixteen defenses in response to Su's claims against it. ECF No. 87 at 30–32. Su now seeks summary judgment on all of WKSA's affirmative defenses. ECF No. 105-1 at 4. Because the court recommends granting WKSA's motion for summary judgment on nearly all of Su's claims, most, if not all, of WKSA's alleged defenses are moot. The only remaining claim against WKSA is Su's right of publicity claim. The court analyzed WKSA's relevant defenses as necessary in the analysis above. The court need not address those defenses again here. Su's motion for summary judgment on WKSA's defenses should be denied as moot.

### *5. Conclusion*

For the foregoing reasons, the court recommends that Su's Motion for Summary Judgment, ECF No. 105, be **GRANTED in part and DENIED in part;** Pak's Motion for Summary Judgment, ECF No. 104, be **GRANTED;** Su and Pak's Motions to Dismiss, ECF Nos. 89 and 90, be **DENIED as MOOT;** Su's Motion to Strike, ECF No. 102, be **DENIED as MOOT;** Defendants' Motion for Summary Judgment, ECF No. 109, be **GRANTED in part and DENIED in part;** and Defendants' Motion to Strike Experts, ECF No. 110, and Su's Motion to Exclude Testimony, ECF No. 108, be **DENIED** without prejudice to refiling as motions in limine before the trial judge. Accordingly, the court recommends

Su v. Gaya Won, LLC, Not Reported in Fed. Supp. (2024)

2024 WL 5301787

that all causes of action be dismissed, except WKSA's claim for trademark infringement against Su, and Su's claim for the violation of his right to publicity against WKSA. Again, the claims against Paul have been addressed separately.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 5301787

---

**Footnotes**

1    In any event, the sur-reply is improper because it was filed without leave of court. *See United States Envtl. Services LLC v. Emergency Response & Training Sols., Inc.*, No. 4:18-CV-1031, 2018 WL 4334008 (S.D. Tex. July 17, 2018) ("a party must file a motion for leave before filing a sur-reply").

2    *Cf. United States v. Delgado*, No. EP-13-CR-00370-DCG, 2020 WL 4353177, at *9 n.10 (W.D. Tex. July 29, 2020) ("[Defendant cites Exhibit 18] without any pincite or quoted excerpt therefrom; consequently, the Court is unable to determine exactly what material in the exhibit supports his proposition in the brief.").

3    The parties did not address the digits of confusion at all.

4    The translator declared that they are a registered court interpreter, and a notary certified the interpreter's declaration. *Id.* at 143–44, 147–48.

5    Su's Second Amended Verified Complaint also contains the conclusory statement, which Su did not provide in his response, that "[a]s a result of [WKSA's] unfair, deceptive, and fraudulent acts or practices, [Su] has lost sales of [his] own[.]" ECF No. 55 ¶ 106. This is overly broad and conclusory and does not connect any act by WKSA to any specific interference with Su's ability to conduct business. Su does not include evidence by an expert, any market analysis, or other relevant evidence showing this element of his claim. As such, Su's statement is insufficient to create a fact issue about whether WKSA interfered with Su's ability to conduct business.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.